A05A1193, A05A1194. IN THE INTEREST OF R. M. et al., children (two cases).
(624 SE2d 182)

BARNES, Judge.

In these two related cases, the mother and father[1] of R. M. and R. M., Jr. ("Jr.") each separately appeal from the juvenile court's order adjudicating the children deprived, and both contend that there was no clear and convincing evidence that the parents did not comply with their tuberculosis treatment which was the basis for the deprivation adjudication. We disagree and affirm.

> In reviewing a juvenile court's finding of deprivation, we view the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met.

---

[1] The couple is not married, but apparently live together.

(Footnote omitted.) *In the Interest of C. C.*, 249 Ga. App. 101 (547 SE2d 738) (2001).

The record establishes that the Bibb County Department of Family and Children Services (DFACS) became involved with this family in August 2002 after their now-deceased infant son, A. M., was diagnosed with tuberculosis. While he was hospitalized in Macon, he suffered a debilitating stroke and was placed on a ventilator. His parents requested that he be released from the hospital, and transferred to an Atlanta children's hospital. In addition to a massive stroke and resulting hydrocephalus, he was also diagnosed with TB meningitis. The medical records show that he had a fever for approximately one month before he was admitted to the Macon hospital. One of the attending physicians categorized the ten-month-old as "neurologically devastated," and the prognosis was poor. It was noted that the mother and Jr. had received screening x-rays for TB and the films were clear of any evidence of TB, but that the father's x-ray showed some old TB scarring. The hospital concluded that the father needed to be evaluated for TB "ASAP," and Jr. who was 20 months old at the time, needed prophylactic treatment arranged. A later report confirmed that the health department had reported that Jr. and the mother had negative x-rays, but the father's case was turned over to the health department's district office. The father told the hospital that he would follow up with his primary care physician, but became belligerent when asked for more information about his doctor. He told the hospital social worker that "you are suspect," and hung up the telephone. A progress report filed approximately one week after the infant's arrival in Atlanta revealed that the hospital was having some difficulties with the parents:

> Dealing with the parents has been a major issue both here and in Macon. According to the information obtained from Health department[,] father is a known schizophrenic [with] multiple stays at the state hospital as well as multiple incarcerations. With discussions involving him, he will get very paranoid quickly and can get very upset and angry. Their [sic] has been a major problem effectively communicating to the parents the nature of, and extent of [the infant's] illness. . . . I believe that [the parents] legitimately do have problems understanding what is going on. It is for this reason that I would like the brother and father's TB therapy to be DOT [(directly observed preventative therapy)], because I don't believe they truly understand how important that therapy is despite multiple attempts to explain it to them.

In early September, the record shows that Jr. had not started his prophylactic treatment and that the father "won't tell where the child is." The report reflected that DFACS had been notified but "hasn't acted," and that the "Dad has one positive sputum growing."

A September 11, 2002 report from a Department of Human Resources public health laboratory revealed that the father had "an active case of Tuberculosis and needs to complete 6 months of therapy." Also, the hospital's September 20, 2002 progress report stated that "the mother's intellectual limitations and inability to act independent from the father's inappropriate influence makes compliance and safety of home care highly risky." Although there was some preparation toward placing the infant in a state hospital, on September 24, 2002, the baby was released from the hospital to his parents "as DFACS had not deemed it necessary to take custody of the patient." The discharge summary noted that

> [t]here was difficulty in convincing the family of the need for close followup for the patient's sibling, [Jr.], as well as for his father and mother. In the end, it was noted that the father's sputum was positive, and he did begin treatment. He is thought to be the source case. At this point, the sibling and the father are under direct observed therapy by the health department.

DFACS was apparently working with the parents to obtain their consent to place the child in a state hospital, but the parents would not agree and instead took the infant home. The child died the day after his discharge after presenting to a Macon hospital in full arrest.

Although the mother had normal chest x-rays, at some point she was diagnosed with a noncontagious strain of latent TB. According to the Georgia Department of Human Resources division of public health, latent TB is not considered "a case of TB," but "treatment is an essential means to controlling and eliminating TB." In March 2003, DFACS filed a petition alleging that Jr. was deprived because of the father's TB.

The petition and subsequent hearing transcript are not included in the record, but the mother apparently stipulated that Jr. was deprived. The father was not present at the hearing because he had been involuntarily committed for six months to a sanitarium in South Carolina for treatment of his TB. The court ordered that Jr. was to remain with the mother, provided that she cooperate with DFACS and continue to follow the treatment recommendations of the health department. The mother signed a case plan to that effect, but after the father came home, the mother refused treatment for her latent TB, the couple would not cooperate with DFACS, and they denied

caseworkers access to their home. Consequently, DFACS filed a motion to modify the previous order, asking that temporary custody of Jr. be removed from the mother and placed with the Department.

Neither parent was present at the hearing on the motion to modify, although both were served. At the August 27, 2003 hearing, caseworkers testified that the mother, who was now pregnant, told them she was refusing treatment because she was pregnant and had read that treatment should be delayed until after the birth of her child. The Department, however, believed that the mother was "under the thumb of the father and has been and has sort of been following his lead on these things." One caseworker testified that when the father is present, "[the mother] just totally lets him take over. And all he does is stomp around the apartment and rant and rave." It was also noted at the hearing that the local health department was refusing to administer treatment to the couple because of their past behavior, including "terroristic threats," and threats to sue the agency. The health department said that it would provide medications to the mother's doctor for administration.

The court followed DFACS's recommendation and removed custody from the mother. In its order for shelter care of Jr., the juvenile court found that the "mother has latent TB, refuses medication thus risking conversion to active TB [and] endangering child. Mother and father refuse to cooperate [with] in-house supervision by DFACS." A follow-up summary from the Department recommended that Jr. be placed with his maternal grandmother. The report also noted that Jr. had been tested for TB and the results were negative. The succeeding reunification case plan indicated that the parents were to, among other things, keep all scheduled medical appointments, attend and complete counseling sessions as needed, complete parenting classes, and demonstrate the ability to care for their own medical needs. The parents did not sign the case plan.

In October 2003, after completing its investigation of the grandmother's household, DFACS filed a motion to modify which would transfer custody of Jr. to the maternal grandmother. The hearing on the motion was continued to allow the parents time to retain counsel. In the interim, DFACS was awarded temporary custody of Jr., pending the hearing on the motion to modify.

A hearing on the motion to modify custody of Jr. was held on November 5, 2003, in conjunction with a new shelter care order on behalf of R. M. who was born on November 1. The trial court again continued the hearing on the motion to modify, but conducted the shelter care hearing on R. M. Ultimately, the juvenile court denied the shelter care order, finding that the danger to the baby was not imminent. DFACS, however, retained temporary custody of Jr. The court concluded that,

> [w]e do not have evidence about how quickly [the TB] would go active, whether or not there would be a warning, whether or not an intervention could be made, based upon signs and symptoms of the thing going active or how long it would take between the beginning of signals and the time that the child would actually be in danger. Since we are coming back in two weeks and since there is no indication that the mother is, at the moment, active, I'm going to deny the shelter care order.

The juvenile court cautioned the parties that "imminency of danger is no longer the criteria in two weeks and things change. We're going to have to consider what the long-term interests of the child are at that time."

DFACS filed a deprivation petition as to R. M. on November 19, 2003, and on December 3, the juvenile court held a hearing on R. M.'s deprivation petition and the motion to modify custody of Jr. At the hearing, a caseworker testified that the mother failed to comply with the two case plans developed for her. She did not receive treatment for her latent TB, and once the father returned home, the couple would not allow the Department into their home. Although R. M.'s pediatrician was not present at the hearing, a stipulated statement from the doctor was introduced in which the doctor opined that the mother "was a ticking time bomb. And if she did not get the preventive treatment she would have a dead baby on her hands." The Department also introduced a letter to the juvenile court from the Georgia Department of Human Resources division of public health referring to the Georgia Tuberculosis Reference Guide, which stated that

> A pregnant woman with a positive skin test and negative chest x-ray . . . should be started on treatment for [latent TB infection] . . . *immediately* if they have one or more of the following risk factors: Documented recent tuberculin skin test conversion; . . . Close contact of patient with AFB smear-positive pulmonary TB, at physician's discretion.

The letter noted that the mother had two of the three risk factors.

The mother submitted a negative chest x-ray taken shortly before the hearing. She argued that the evidence did not prove that she was a danger to her children. She also maintained that it was never proved that the father had active TB, and that he was sent to the South Carolina facility for contempt of court, rather than for treatment of TB. She also testified that she was not told that she had or needed to be treated for latent TB. She also maintained that after the birth of R. M., treatment was only indicated "if necessary" despite

the fact that a document from her obstetrician directed that "preventative treatment should be [administered] after delivery." The document also noted that the mother "refused to take the medication after reading the PDR [(Physician's Desk Reference)]. The PDR stated that a pregnant woman should take this medication only when necessary." The father, who was proceeding pro se at the time, testified at the hearing that he was treated for TB in 1987, but that he did not believe the 2002 diagnosis of TB. He also testified that he did not believe the mother had latent TB. The guardian ad litem testified that in this case

> [i]t's especially troubling when there's been evidence that one child already has died of possibly a tubercular related illness. I have an uneasy feeling that for [the father] it is more important to be right than to safeguard the child of any possibility of disease. . . . I would find these children deprived at this time as long as [the mother], with diagnosed tuberculosis, is untreated.

Thereafter, the court found R. M. deprived because of the mother's failure to comply with the case plan and refusal to cooperate with DFACS. It also granted the order modifying custody of Jr. and giving temporary custody of both children to the Department. The court expressed concern over what it felt could be a "very deadly situation."

The father filed a notice of appeal, which was stayed after the parents filed separate motions to reconsider and present new evidence. At the February 25, 2004 hearing on the motions to reconsider, the juvenile court denied the father's motion because of his lack of standing as the children's putative father, but allowed him to submit a petition to legitimate, and reserved ruling on the mother's motion until the legitimation issue was resolved. The legitimation petition was later granted. The Department submitted a concurrent case plan[2] for the children containing essentially the same requirements as the previous plan, including that the parents receive treatment, attend parenting classes, receive a psychological evaluation, and demonstrate the ability to care for the children, which the parents again refused to sign.

On April 6, 2004, the hearing was resumed on the mother's motion to reconsider, but both parents were allowed to reopen the evidence. The Tuberculosis Nurse Coordinator for the Georgia Department of Human Resources, Division of Public Health, Infectious

---

[2] A concurrent case plan is a joint reunification and nonreunification case plan which stipulates reunification if the parents complete their case plan, and nonreunification otherwise.

Disease Unit, testified that the father came into her care in 2002 and completed his treatment on May 27, 2003. She testified that public health became involved when the father refused to take his medication, but that he had completed his treatment and "he was no longer considered a threat." She admitted that the father was sent to South Carolina "involuntarily by [a] superior court judge because he refused to cooperate with the treatment." The nurse also testified that throughout this period the father denied he had TB, even though he was told otherwise. She testified that she was not aware that this was the father's second case of active TB.

The nurse described latent TB as "active but not infectious." She testified that the mother had tested positive for TB with a skin test in 2002, but that a chest x-ray that year and in 2004 were negative. She further testified that if someone tests positive for latent TB, as had the mother, a prescribed treatment is recommended by her agency "as a precaution to try to keep the tuberculosis bacteria under wraps." The nurse testified that there was no law, however, to make them take the medication, and it was up to the individual. She further testified that there was no definitive answer as to how fast latent TB could turn into active TB, and "an individual can have active, can have TB, the infection and live to be 150 years old and never break down with TB. On the other hand someone can have a positive skin test, have the TB infection, and break down within matters of months." She testified that it depends on the individual's immune system and how "well and healthy they stay." The nurse stated that the medications for the treatment of active or latent TB are free, and the mother can be monitored anytime she wants simply by "walking through the door." She said that many people do not take the medication because "they just don't want to be bothered with taking medicine, a pill for nine months." The nurse recalled that the mother had refused to take the medication because she "denied that she had any form of the tuberculosis, latent, active or otherwise." She testified that any risks of treatment were greatly outweighed by the potential benefit.

The nurse testified that based on her experience, the children would not be in danger of contracting TB while residing with the mother and father, but that children under five are at a greater risk of catching TB than an adult if one of the parents should develop active TB. She had explained to the mother that, although it was her decision whether she took the medication, "[the mother] fell in the category of individuals as a converter, meaning that she hadn't had a positive skin test and all of a sudden she converted. That she stood a chance of breaking down within the first two years." The nurse agreed that it was possible for an individual with latent TB to become active without showing symptoms, but that there was usually some indication of illness. She testified that it was possible that the mother could

have developed active TB in the two-year period between the mother's positive skin test and her chest x-ray without the health department's knowledge.

The supervisor of the infectious disease unit testified that the mother and father did not pose a threat to their children as long as they continued to receive periodic screenings for the disease. He acknowledged that the couple's cooperation was voluntary and that there was no way to fully monitor them. He also testified that he was aware that the couple had not cooperated with the health department in the past.

The juvenile court continued the hearing to give the parties an opportunity to obtain the medical records of the child who had died. The court found that the diagnosis and cause of death of the ten-month-old was still an issue that needed to be resolved. The hearing was resumed on August 6, 2004, and the medical examiner testified that the baby's cause of death was undetermined. He explained that, while the baby did have tuberculous meningitis, based on information he had received from the treating physicians, he "could not rule out a non-natural cause of death on the infant." The doctor testified that had it not been for the suspicion of nonnatural death, he would have ruled that the baby died of tuberculous meningitis. He further testified that with the medical treatment available today, it was rare for young children to die of this disease, and that this fact caused him to conclude that the infant had been left untreated for "a long period of time."

The guardian ad litem noted that the children were doing well in their placement with the maternal grandmother. She stated that,

at a very early stage, I think my recommendation would have been to ask that the children be returned to these parents under mandatory medical exams at an appropriate interval. As the case has developed, I have had to change my mind and say these children should not be returned to these parents unless the mother complies with the recommendation of the health department to have the proper treatment. We have here a very argument, a very argumentative, controlling oppositional father who I — from observation would say is the one who has made that decision [to not receive treatment] for the mother of this child. . . . The risks for not obtaining that treatment could mean serious disease and possibly another death. And the reason why I now feel that these parents might not be able to be trusted to recognize a future sign of any tuberculosis is that they clearly didn't do that the last time. The medical records state that

the child had been ill for one month before they brought him for medical attention.

The juvenile court found the children deprived because

their lives and health are threatened by a course of conduct by the parents which has already contributed to the death of a sibling[;] I also find their emotional health may be endangered as well. The extreme truculence of the father and unwillingness of both parents to protect these children from infectious disease is the reason the children cannot be adequately and safely protected at home.

Both parents argue that DFACS had failed to establish by clear and convincing evidence that the children were deprived. The mother contends that the Department has not shown that the children are at risk from her latent TB, and the father maintains that he poses no risk to the children because he completed his TB treatment.

As defined in OCGA § 15-11-2 (8) (A), a deprived child is a child who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals. . . ." In considering a deprivation petition, "[t]he petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue." (Citation and punctuation omitted.) *In the Interest of J. P.*, 267 Ga. 492 (480 SE2d 8) (1997). "[T]he deprivation must be shown to have resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child." (Citation and punctuation omitted.) *In the Interest of S. S.*, 232 Ga. App. 287, 289 (501 SE2d 618) (1998). As noted previously, there must be clear and convincing evidence of deprivation, and applying this standard, we find that the juvenile court's deprivation order was supported by clear and convincing evidence.

First, we commend the juvenile court on the thoughtful and thorough manner in which it handled this difficult case. The facts are exhaustive and the record extensive, which speaks eloquently of the court's high regard for the sanctity of these parents' right to raise their children. That being so, the primary factor in determining whether the children are deprived is not the parents' circumstances, but the children's need. We have previously held that the parents' choice in exposing their children to "dangerous living environment showed a lack of parental judgment and careless disregard for the child[ren's] health and safety." *In the Interest of B. M. B.*, 241 Ga. App.

609, 610-611 (527 SE2d 250) (1999). Moreover, one of the noted factors is proof that a parent has unjustifiably failed to comply with a previously ordered plan designed to reunite the family. OCGA § 15-11-58 (h) (1).

While there was evidence that latent TB did not pose any risk to the children as long as the parents remained noncontagious, if the TB became active the children would be at extreme risk for contracting a potentially fatal disease. In different circumstances, this risk would not mean that the children were deprived, because as the TB nurse pointed out, there are a great number of individuals with latent TB who never become contagious. And with regular screenings and monitoring, any risk to others could be contained.

In this circumstance, however, a ten-month-old child died after suffering complications from TB. He was symptomatic for at least one month before he received treatment. His father has been diagnosed with TB on two different occasions, and had to be involuntarily committed to receive treatment on one occasion. After his last diagnosis, the father refused to acknowledge that he had TB. The mother, likewise, has refused to cooperate with the health department. She has refused to take recommended medication, even though doing so would greatly decrease any risk to her children of contracting TB. She refused to acknowledge that the father had TB when he was sent to the sanitarium, and appeared reluctant to admit that TB had any role in her baby's death. The health department admitted that there was nothing that it could do to ensure that the parents were monitored; to do so was strictly voluntary. From all indications, the parents will continue to refuse to cooperate with any agency, unless or until they are forced to, or another tragedy occurs.

Here, "[t]he juvenile court properly based its ruling on concern for [the children]. It is well established that deprivation focuses upon the needs of the child regardless of parental fault. The evidence presented was sufficient to support the juvenile court's finding of deprivation." (Citation and punctuation omitted.) *In the Interest of K. J.*, 268 Ga. App. 843, 845 (1) (a) (602 SE2d 861) (2004).

*Judgment affirmed. Ruffin, C. J., and Johnson, P. J., concur.*

DECIDED NOVEMBER 16, 2005 —
RECONSIDERATIONS DENIED DECEMBER 7, 2005 —

*William A. Matos*, for appellant (case no. A05A1193).
*Renate D. Moody*, for appellant (case no. A05A1194).

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Andrew S. Foster,* for appellee.