## A10A0979. IN THE INTEREST OF R. J. D. B., a child.
(700 SE2d 898)

PHIPPS, Presiding Judge.

The mother of R. J. D. B. appeals the Cobb County Juvenile Court order terminating her parental rights. She challenges the sufficiency of the evidence. She also contends that the juvenile court did not have authority to enter prior deprivation orders and that she was denied the right to counsel in connection with the underlying proceedings. The mother has demonstrated no reversible error, and we affirm.

1. The mother contends that the evidence was insufficient to support the termination. OCGA § 15-11-94 sets forth the relevant, two-step procedure for termination of parental rights.

> First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[1]

This court views the evidence in the light most favorable to the juvenile court's ruling to determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated.[2]

The record shows that five-year-old R. J. D. B. was taken into protective custody on September 15, 2006, and the Cobb County Juvenile Court entered a deprivation order the following month.[3] The juvenile court found that the child and her mother were living with the child's maternal grandmother, but the grandmother no longer wanted the child's mother in her home; therefore, the child's mother did not want the child to live with her maternal grandmother. The court further noted that the mother had four other children, all living with their maternal aunt who had guardianship over them. In addition, the court cited the mother's admitted use of

---

[1] *In the Interest of J. R. N.*, 291 Ga. App. 521, 525 (2) (662 SE2d 300) (2008) (footnote omitted).

[2] *In the Interest of T. J. J.*, 258 Ga. App. 312, 314 (574 SE2d 387) (2002).

[3] See OCGA § 15-11-58 (e).

marijuana within the previous 30 days. The court found the mother to be homeless, unemployed, in need of substance abuse treatment, and unable to provide R. J. D. B. with basic necessities.[4] The child was placed in the temporary custody of the Cobb County Department of Family and Children Services (DFCS).

Thereafter, the mother agreed to a case plan designed to reunite her with R. J. D. B. Among other things, the case plan required the mother to obtain and maintain a source of income and support for the child; obtain and maintain housing suitable for the two of them; obtain childcare services for R. J. D. B. at all times (once the child was returned to her custody); successfully complete a parenting class; submit to a psychological evaluation and follow all recommendations resulting therefrom; obtain a substance abuse assessment and follow all recommendations of substance abuse treatment providers; submit to random drug screens and test negative when screened; and visit R. J. D. B. as scheduled.

About a year later, the juvenile court held a hearing on October 17, 2007, after which it entered an order ruling that R. J. D. B. remained deprived and thus extending DFCS's custody of the child. Again, the following year, the juvenile court held a hearing on September 11, 2008, after which it entered an order ruling that R. J. D. B. was still deprived and thus extending DFCS's custody of her.

In April 2009, after several years had passed since R. J. D. B. had been removed from her mother's custody, DFCS filed a petition alleging that the child remained deprived due to parental misconduct or inability and seeking termination of parental rights. In September 2009, the juvenile court held a hearing on the matter, at which the following evidence was adduced.

A DFCS caseworker who had been assigned to the case since November 2006 reported on various goals set forth in the case plan. In 2007, the mother had submitted to a psychological evaluation and had completed a parenting class. Regarding the mother's visitations, which were scheduled for every other Wednesday afternoon, the caseworker reported that the mother had maintained consistent visitation with R. J. D. B. until the summer of 2008, when her appearances for the visitations waned to sporadic. For example, the mother did not visit R. J. D. B. between August 2 and September 17; there were two visits in October, one visit in November, then no further visit until January 21, 2009. And during that part of 2009

---

[4] The court also found that the child's father was incarcerated. In the same order appealed, the juvenile court terminated the father's parental rights. That ruling is not at issue in this appeal.

preceding the termination hearing, the mother appeared at about half the scheduled visitations.

Meanwhile, the mother reported to DFCS in September 2008 that she had lost her job. Also about that time, her telephone service was disconnected. And although she had begun missing numerous visitations about that time, the mother did not call the caseworker to inquire about R. J. D. B.'s well-being.

The caseworker reported that the mother had attended a drug treatment program and had passed the random drug screens administered through October 2008. But in November 2008, January 2009, and August 2009, she tested positive for marijuana. On several occasions, the caseworker discussed with the mother obtaining another drug assessment, but the mother never made an appointment for an assessment, revealing that she felt that R. J. D. B. would never be returned to her and so did not see the point.

After being informed that the mother had lost her most recent job, the caseworker continued to ask about her employment status. The mother claimed that she could not find a job, but provided no details regarding when or where she had sought employment. In addition, the mother provided the caseworker no details regarding how she would manage childcare if she obtained employment and regained custody of her child.

The day before the termination hearing, the caseworker recalled, the mother gave her documentation showing that she was living in a one-bedroom apartment under the "Section Eight" program. The mother further informed the caseworker that, if her child were returned to her, she would qualify for a two-bedroom apartment.

R. J. D. B.'s foster mother, with whom the child had lived during the approximately two-and-a-half years preceding the termination hearing, also testified at the hearing. The foster mother recalled that R. J. D. B. had come into her care when she was in kindergarten; the school soon notified her that the five-year-old child could not read; and R. J. D. B. had to repeat kindergarten. The foster mother recounted that she had worked with R. J. D. B. and that, by the following year, the child was reading. As of the hearing, R. J. D. B. was in the second grade. The foster mother testified that she was working full-time, had enrolled the child in an after-school program, and could financially afford to provide for R. J. D. B. The foster mother also had integrated R. J. D. B. into her own extended family's dinners and vacations. The foster mother reported that she had had no difficulty with the child. However, for a smoother adjustment to their new circumstances, she had enrolled the two of them in family counseling and had obtained individual counseling for R. J. D. B. The foster mother described R. J. D. B. as a "full of energy, fairly happy

child, [who] loves to play." The foster mother testified that she was hopeful that R. J. D. B. would remain with her, and that if parental rights were terminated, she intended to adopt her.

R. J. D. B.'s mother also testified at the hearing. She acknowledged that she had four children older than R. J. D. B. and explained how they, too, had been removed from her custody. In the mid-1990s, she left Georgia for about six months to travel with the father of two of her children. She was not seeking any job opportunity, but accompanied him to Texas, Missouri, and Colorado to determine whether she would like living in any of those places. She left her children with their maternal grandmother while she was away. After suffering two strokes, the grandmother told the mother that she could no longer keep the children. At that time, the mother recollected, she did not have a stable residence. Therefore, custody of her children was transferred by court order to their maternal aunt.

R. J. D. B. lived with her mother until she was about four years old. When R. J. D. B. became of school age, the mother recounted, she (the mother) was living with her hairdresser in DeKalb County. The mother testified that she, therefore, "didn't have a permanent stable address to put [R. J. D. B.] in school." And because she and her hairdresser both had jobs, there was no one at home to care for R. J. D. B. The mother testified that her own sister — who was then living in Cobb County and who was already caring for the mother's four older children — did have stable housing. So, the mother took R. J. D. B. to live with that sister and asked her to "get [R. J. D. B.] in school." At that time, the sister also had four children of her own living with her, as well as R. J. D. B.'s maternal grandmother.[5]

At the hearing, the mother gave an account of her four older children. All of them remained outside her custody. Three of them still lived with their maternal aunt, who had moved to Chicago; the mother saw them several times a year. Her oldest child was 20 years old and lived in Cobb County. The mother conceded that she had never petitioned to have her custody restored as to any of those four children.

The mother testified that R. J. D. B.'s father had been unable to financially assist them. As she explained, he was often incarcerated or else "on the street himself; he's in a homeless shelter."

Given these circumstances, the mother testified, she understood that the case plan required her, among other things, to get a job. She began working in 2007, had worked at three different companies, was fired from two of them for not following certain business rules,

---

[5] It was from this home that R. J. D. B. was initially taken into custody by DFCS in September 2006.

and had not had any job since June 2008. Regarding managing her own expenses, she claimed that her aunt was giving her $200 to $300 each month, which she used to pay household bills; that she occasionally earned "maybe a hundred and fifty" dollars in a month doing chores for other people,[6] which she also used to meet her household expenses; and that each month, she received $200 in food stamps.

The mother testified that her visitations with R. J. D. B. became sporadic because she could no longer afford transportation to the scheduled site, pointing out that about that time, she had been fired from her last job. And soon thereafter, her telephone service was disconnected for nonpayment; she had no money to resume service; consequently, she temporarily lost contact with DFCS. The mother explained that it took her between an hour and a half and two hours to get to see her daughter, and she had not known that transportation assistance was available for visitation: "I thought it was all on me to visit with [R. J. D. B.]."

The mother admitted that, about a month after losing employment, she began using marijuana again. She explained that she did so under the stress of R. J. D. B.'s removal from her custody and the possibility of not having her returned. She testified that she had considered entering another drug treatment program, but did not have bus fare to get there. Furthermore, she testified that she did not believe that she had a drug problem, claimed further that she had not used marijuana in about two months, and characterized resorting to marijuana as "a big mistake." She acknowledged, "I need a job and I know if I need a job I can't be dirty"; she asserted that she was willing to enter a substance abuse treatment program; and she professed that if given another opportunity, she would be successful.

The mother testified that she had moved into her own apartment in March 2008, about a year and a half after R. J. D. B. was removed from her custody. She left that apartment "[b]ecause my Section Eight kicked in." She moved to a subsidized residence in May 2009; to continue living there, she testified, "I have to find a job or go to school."

However, the mother testified that she had been unable to find a job since being terminated in June 2008. She recounted that she had inquired about certain jobs, but had been told that those jobs required the candidate to have earned a high school diploma or equivalent. She had neither, having dropped out of high school in the tenth grade. Moreover, she testified that, since losing her last job, she had been unable to find an available GED program. When asked

---

[6] As examples, the mother listed hair braiding and residential cleaning.

specifically how she would provide for R. J. D. B. if the child were returned to her custody, she promised, "I would get me a job. Trust and believe that I would get me a job." She also proclaimed, "I will do anything possible to get my daughter."

The guardian ad litem testified that the mother had taken years to comply with parts of the case plan that should have taken only months; that when the mother encountered adversity, she essentially gave up; and that when termination proceedings proved imminent, she made mere "token" efforts. The guardian ad litem thus recommended to the court that the mother's parental rights to R. J. D. B. be terminated.

In terminating the mother's parental rights, the juvenile court determined that there was clear and convincing evidence of parental misconduct or inability and that termination of the mother's parental rights was in R. J. D. B.'s best interest.[7] The court cited numerous contributing circumstances, inter alia, that: the child was initially found deprived partly because her mother was without the means and stability to appropriately provide for the child's necessities; the mother had failed to comply with a case plan designed to reunite her with the child; the mother had failed to establish stable employment; the mother had failed otherwise to establish financial stability;[8] the mother had failed to establish stable housing;[9] she had continued her use of marijuana, having relapsed since completing a substance abuse treatment program; the mother's visits with the child had been erratic; the mother had failed to make a bona fide attempt to communicate with the child in a meaningful, supportive, parental manner; the mother had continued to neglect the child's physical, mental, and emotional needs; the mother had a history of not providing for her four other children; R. J. D. B. had been in DFCS's custody for approximately three years; and R. J. D. B. was in need of stability.

(a) The mother does not challenge the juvenile court's findings that R. J. D. B. was deprived as alleged in the termination petition or that the lack of proper parental care or control was the cause of the deprivation. The mother argues instead, inter alia, that there was not sufficient evidence to show that the deprivation was likely to continue or would not be remedied. She claims that she substantially completed her case plan in 2007 and thus demonstrated that she can

---

[7] See OCGA § 15-11-94 (a).

[8] The court noted that the mother relied on relatives or friends for her financial needs.

[9] At the end of the termination hearing, the court remarked that the mother's housing situation was "very shaky," given the mother's testimony that in order to remain in her "Section Eight" housing she would need either to find employment or to enroll in school and that she had been unable to do either.

complete a case plan. She maintains that, if given another opportunity to obtain a job, she will again meet the goals of other case plans, including remaining drug free.

Essentially, the mother is asking this court to reweigh the evidence and reevaluate the credibility of witnesses, which we will not do.[10] While the record does show the mother's efforts at complying with some aspects of the case plan, what weight to give improvements was a question for the trier of fact.[11] Likewise, "[j]udging the credibility of her good intentions was a task for the juvenile court."[12] Moreover, the juvenile court was authorized to consider the mother's past conduct in determining whether the causes of deprivation were likely to continue.[13] And "[t]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[14]

Here, the mother's history demonstrated an unwillingness or inability to maintain employment or otherwise financially provide and care for R. J. D. B. From June 2008 through the date of the termination hearing in September 2009, she had failed to find any job. At the hearing, she claimed that she had applied for three jobs during that month; she conceded that, during the preceding month, she did not apply for any job. The mother had not had custody of her four other children for a significant period,[15] and her visits with R. J. D. B. were sporadic. In addition, the mother had begun using marijuana again, as recently as a few months prior to the termination hearing. Despite the mother's efforts to comply with some aspects of the case plan and her promises at the termination hearing, the juvenile court's finding that the cause of the deprivation was likely to continue was supported by clear and convincing evidence.[16]

YALE LAW LIBRARY

---

[10] *In the Interest of R. C. M.*, 284 Ga. App. 791, 796 (I) (2) (645 SE2d 363) (2007).

[11] Id. at 796 (I) (3).

[12] *In the Interest of A. G.*, 253 Ga. App. 88, 90-91 (1) (c) (558 SE2d 62) (2001).

[13] *In the Interest of A. G.*, 293 Ga. App. 493, 496 (1) (667 SE2d 662) (2008).

[14] Id. (citations and punctuation omitted).

[15] See OCGA § 15-11-94 (b) (4) (B) (v) (in determining whether child is without proper parental care and control, the court shall consider, without being limited to, the physical, mental, or emotional neglect of the child or evidence of past physical, mental, or emotional neglect of the child or of another child by the parent).

[16] See *In the Interest of R. C. M.*, supra (finding that clear and convincing evidence supported juvenile court's determination that mother's recent stable housing and income and unsubstantiated claims of drug rehabilitation were outweighed by her four-year abandonment of the children, recent drug use, failure to control her seizure disorder, and failure to maintain a bond with the children); *In the Interest of M. N. R.*, 282 Ga. App. 46, 47 (637 SE2d 777) (2006) (juvenile court's finding that deprivation was likely to continue was supported by clear and convincing evidence where the mother had failed to complete drug treatment program required by her plan, relapsed after she had completed an earlier program, tested positive for drugs about a month before the termination hearing, failed to visit and bond with the child, and failed to meet the other goals of her reunification plan); *In the Interest of J. G.-S.*, 279 Ga.

(b) The mother argues that the evidence was insufficient to show that continued deprivation would likely cause serious physical, mental, emotional, or moral harm to the child.

> We have held that evidence of a mother's repeated failure to remain drug free and her failure to take the steps necessary to reunite with the children was sufficient to prove that the continued deprivation would cause the child serious physical, mental, emotional, or moral harm. Additionally, it is well settled that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems.[17]

Thus, a juvenile court is "authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child."[18]

Here, the evidence showed that the mother was unable or unwilling to remain drug free, to maintain consistent visitations with R. J. D. B., and to take other steps necessary to reunite herself with her daughter. There was also evidence of a reasonable prospect for adoption, which would be significantly enhanced if the mother's parental rights were terminated.[19] The evidence supported the juvenile court's finding that continued deprivation would likely cause serious physical, mental, emotional, or moral harm to R. J. D. B.[20]

(c) The mother argues that the evidence was insufficient to show that it was in the child's best interest to terminate her parental rights. The same evidence showing parental misconduct or inability may support this requirement,[21] and it does here. Moreover, R. J. D. B. had been in DFCS's custody for three years by the time of the termination hearing. She was doing well with her foster mother, who wished to adopt her.[22] We find no error in the juvenile court's

---

App. 102, 103 (1) (c) (630 SE2d 615) (2006) (evidence that the mother was taking classes to obtain her GED and had an offer of employment that she planned to accept following the termination hearing was not conclusive of parental fitness in light of the mother's history of neglect).

[17] *In the Interest of M. N. R.*, supra at 48 (citation and punctuation omitted).

[18] *In the Interest of J. R. N.*, supra at 526-527 (2) (punctuation and footnote omitted).

[19] See id. at 527 (2).

[20] See *In the Interest of R. C. M.*, supra at 797 (I) (4); *In the Interest of J. R. N.*, supra.

[21] See *In the Interest of S. G.*, 271 Ga. App. 776, 781 (611 SE2d 86) (2005); see also *In the Interest of J. G.-S.*, supra at 104 (2).

[22] See *In the Interest of S. G.*, supra (in determining whether termination of parental rights is in the best interest of the child, court may consider that the foster parent, with whom child had been living since being placed in DFCS's custody, had expressed an interest in adopting child).

conclusion that termination was in the child's best interest.[23]

Accordingly, there is no merit in the mother's arguments that termination of her parental rights was not authorized by the evidence.

2. The mother contends that the juvenile court did not have jurisdiction to terminate her parental rights. She claims that, in its original deprivation order entered in October 2006, the juvenile court "include[d] a finding that both the mother and child reside[ ] in DeKalb County and transferred jurisdiction and physical custody of the minor child to DeKalb County." This claim, however, mischaracterizes the cited order.

In that order, the juvenile court noted the mother's testimony that she was currently residing in DeKalb County, as well as DFCS's announced plan to reunite R. J. D. B. with her mother. The juvenile court even found it to be "in the best interest of the child to transfer the above referenced matter to DeKalb County Juvenile Court." Although the juvenile court may have thus contemplated a transfer of the case, the order plainly did not effect one. To be sure, the cited order provided that,

> [p]ending said transfer[ ], the child shall remain in the temporary custody of the Division of Family and Children Services of the Georgia Department of Human Resources, acting through the Cobb County Department of Family and Children Services or the DeKalb County Department of Family and Children Services.[24]

But the mother cites no order effecting any transfer of the case to the DeKalb County Juvenile Court; we find no such order; and the record is clear that R. J. D. B. remained in the custody of the Cobb County Department of Family and Children Services.

At any rate, the mother's argument is properly characterized as a challenge to venue. OCGA § 15-11-29 (a) provides that a juvenile proceeding "may be commenced in the county in which the child resides," or "[i]f deprivation is alleged, the proceeding may be brought in the county in which the child is present when it is commenced." "Moreover, as to venue, it may be presumed as a matter of law, subject to rebuttal, that a child placed in the custody

---

[23] See *In the Interest of R. C. M.*, supra at 797 (II) (where children had been without their mother's care for over six years, the mother had failed to remain drug free, failed to maintain a bond with her children, and failed to take the steps necessary to reunite with the children, juvenile court's finding that termination of the mother's parental rights was in the children's best interest was authorized); *In the Interest of J. G.-S.*, supra.

[24] (Emphasis supplied.)

of a county department of family and children services thereafter assumes the residence of that county department."[25] The record reveals that R. J. D. B. was residing in Cobb County when the underlying proceeding alleging deprivation commenced and had remained in the custody of Cobb County Department of Family and Children Services through the time the termination order was entered. Accordingly, requirements for venue in Cobb County were met.[26]

3. The mother contends that the order entered after the October 17, 2007 hearing, wherein the juvenile court ruled that R. J. D. B. remained deprived and thus extended DFCS's custody of the child, was untimely.[27] When the mother had the opportunity to appeal that deprivation and extension order, she did not do so. This court has repeatedly held that prior deprivation orders may not be challenged for the first time during the appeal of a termination of parental rights order.[28] The mother's reliance upon *In the Interest of B. G.*[29] is unavailing as that case is procedurally inapposite.[30]

4. The mother contends that her right to effective assistance of counsel was denied.

(a) First, she asserts that no attorney appeared on her behalf during two hearings: (i) an October 17, 2007, hearing on a motion alleging continued deprivation and seeking extension of custody to DFCS; and (ii) a June 27, 2008 hearing on a motion regarding unsupervised visitation.

This claim, however, was not raised by the mother's counsel in any of the subsequent proceedings before the juvenile court, including the hearing on the motion[ ] for termina-

---

[25] *In the Interest of K. M. L.*, 237 Ga. App. 662, 663 (1) (516 SE2d 363) (1999) (citations and punctuation omitted).

[26] See *In the Interest of C. R.*, 292 Ga. App. 346, 353 (4) (665 SE2d 39) (2008); *In the Interest of K. M. L.*, supra.

[27] See generally OCGA § 15-11-58 (k) (providing that an order of disposition placing deprived child in foster care under supervision of the Division of Family and Children Services shall continue in force for 12 months after date child is considered to have entered foster care or until sooner terminated by the court), (n) (providing that the court which made the order may extend its duration for not more than 12 months, if, among other things, a hearing is held prior to the expiration of the order).

[28] *In the Interest of K. R.*, 298 Ga. App. 436, 438-439 (1) (a) (680 SE2d 532) (2009) (explaining that unappealed deprivation orders remain binding on the parent insofar as they establish that the existence of certain conditions (at the times those orders were entered) constituted a binding showing that the child was deprived as defined under the law).

[29] 231 Ga. App. 39 (497 SE2d 572) (1998).

[30] Id. at 40 (1) (concerning mother's appeal of an order extending custody of her children to a county department of family and children services, where there had been no termination of parental rights; noting prior reversal of the order that had terminated mother's parental rights, which reversal nullified effect of that judgment in all aspects and returned parties to their pre-judgment positions).

tion. . . . We are therefore precluded from considering this argument on appeal. Even if the mother's argument was properly raised, however, she still could not prevail. The mother was represented by counsel at the termination . . . hearing, at which time she failed to challenge any of the findings of fact or conclusions of law previously entered by the juvenile court. In light of the foregoing, the mother has failed to demonstrate prejudice suffered as a result of appearing pro se at the [earlier] hearings.[31]

(b) The mother next charges her attorney with committing error by "stipulating to the unappealed orders." The mother has provided no citation to the record, and this court has no duty to cull the record for any such alleged stipulation.[32] The termination hearing transcript does show that various orders previously entered in this case, which were not appealed, were admitted in evidence without objection. Nevertheless, the mother has failed to show that the juvenile court was not otherwise permitted to consider prior orders entered in this case. It is well settled that "[a] court may take judicial notice of records in the same court."[33] The mother has demonstrated no error committed by her attorney by not lodging what would have been a fruitless objection.[34]

(c) Finally, the mother complains generally that her attorney failed to "make any objections whatsoever at trial when there were many additional grounds to object to such as the orders that were entered, hearsay, improper foundation, etc." The mother has identified no meritorious ground that would have barred the juvenile court from considering during the termination hearing prior orders entered in the case.[35] Regarding the mother's hearsay complaint, "in a nonjury trial, we must presume that the court [was] able to select and consider the properly presented evidence and dismiss the remainder."[36] And given the mother's overall failure to provide any further specificity concerning her challenge to "orders that were

---

[31] *In the Interest of A. P.*, 291 Ga. App. 690, 692 (2) (662 SE2d 739) (2008) (citations omitted). Compare *In the Interest of J. M. B.*, 296 Ga. App. 786, 791 (676 SE2d 9) (2009) (concerning denial of counsel during the termination of parental rights hearing).

[32] See *In the Interest of C. T.*, 286 Ga. App. 186, 187 (1) (648 SE2d 708) (2007). Under Court of Appeals Rule 25 (c) (2) (iii), references to the record must be both to a specific volume or part of the record and by specific page number.

[33] *In the Interest of J. P. V.*, 261 Ga. App. 194, 196 (2) (582 SE2d 170) (2003).

[34] See id. (juvenile court was authorized to consider prior unappealed orders entered in the case); see also *In the Interest of M. E.*, 265 Ga. App. 412, 420 (3) (a) (593 SE2d 924) (2004) (failure to make a meritless objection cannot be evidence of ineffective assistance of counsel).

[35] See Division 4 (b), supra.

[36] *In the Interest of O. M. J.*, 297 Ga. App. 20, 28 (3) (676 SE2d 421) (2009) (citation omitted).

entered, hearsay, improper foundation, etc.," no reversible error has been demonstrated.[37]

*Judgment affirmed. Miller, C. J., and Johnson, J., concur.*

DECIDED SEPTEMBER 10, 2010.

*Jamie L. Smith*, for appellant.

*Thurbert E. Baker*, Attorney General, *Shalen S. Nelson*, Senior Assistant Attorney General, *Kathryn A. Fox*, Assistant Attorney General, *Betty R. Blass*, for appellee.

---

[37] See generally *In the Interest of R. S.*, 287 Ga. App. 228, 232 (2) (651 SE2d 156) (2007) (deeming abandoned the mother's claim of ineffective assistance of counsel at the termination hearing, asserting lawyer's failure to object to inadmissible testimony, where such assertion was supported by neither legal authority nor explanation as to why testimony was objectionable).