710 S.E.2d 611 (2011)
309 Ga. App. 407
In the Interest of R.B., a child.
No. A11A0233.
Court of Appeals of Georgia.
April 22, 2011.
*612 Jamie Lisa Smith, Marietta, for appellant.
Thurbert E. Baker, Atty. Gen., Shalen S. Nelson, Senior Asst. Atty. Gen., Penny Hannah, Asst. Atty. Gen., Sanders Buie Deen, Marietta, for appellee.
ELLINGTON, Chief Judge.
The mother of 15-month-old R.B. appeals from an order of the Juvenile Court of Cobb County that found R.B. to be deprived and that approved a request from the Department of Family and Children Services ("DFCS") to establish a nonreunification case plan. On appeal, the mother contends that there was insufficient clear and convincing evidence presented during the adjudication hearing to prove that R.B. was a deprived child and that she was the cause of such deprivation. She also contends that the evidence was insufficient to prove that Cobb County was the proper venue for bringing the deprivation action. Finding these contentions to be without merit, we affirm.
1. In contending that there was insufficient evidence to support a finding that, at the time of the June 2010 adjudication hearing, R.B. was a deprived child, the mother asserts that the juvenile court improperly relied solely upon evidence that her parental rights to her four older children had been terminated in 2008. As explained below, however, the record shows that, while the court took into consideration the previous termination of her parental rights in determining whether R.B. was deprived, the court also heard substantial evidence showing that the mother's mental, emotional and financial conditions had not changed significantly since 2008 and that, despite the assistance of DFCS and the loss of her four children, the mother still lacked the necessary skills, judgment and resources to properly care for R.B.
*613 OCGA § 15-11-2(8)(A) defines a "deprived child" as, inter alia, "a child who. . . [i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals[.]" "The deprivation must be shown to have resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child." (Citation and punctuation omitted.) In the Interest of R.M., 276 Ga.App. 707, 715, 624 S.E.2d 182 (2005). See also In the Interest of A.R., 287 Ga.App. 334, 335-336, 651 S.E.2d 467 (2007) (accord). In determining whether a parent is unfit, "[a] juvenile court may consider a [parent's] inability to properly care for one child as evidence that she will not be able to care for her other children." (Citation omitted.) In the Interest of A.R., 287 Ga.App. at 336, 651 S.E.2d 467. See also OCGA § 15-11-94(b)(4)(B)(v) ("In determining whether the child is without proper parental care and control, the [juvenile] court shall consider, without being limited to, [evidence of] . . . [p]hysical, mental, or emotional neglect of the child or evidence of past physical, mental, or emotional neglect of the child or of another child by the parent[.]").
When a child has been removed from parental custody, as in this case, DFCS "may prove current deprivation by showing that, if the [child was] returned to the parent ] at the time of the hearing, [he] would be deprived." (Citation, punctuation and footnote omitted; emphasis supplied.) In the Interest of T.V., 302 Ga.App. 124, 127(1), 690 S.E.2d 457 (2010). See also In the Interest of C.H., 305 Ga.App. 549, 559(2)(b), 700 S.E.2d 203 (2010) ("the question is whether, if returned to the parent as of the date of the hearing, the child would return to a state of deprivation because of the parent's lack of proper parental care or control") (citation and punctuation omitted; emphasis in original). Thus, when it is established that a parent has previously deprived, neglected, or abused one or more of his or her children and that the detrimental conditions existing at that time have not significantly changed, a juvenile court is under no obligation to return a child to the parent and wait until the child is harmed in order to find that there is evidence of that child's current deprivation. In the Interest of A.R., 287 Ga.App. at 336, 651 S.E.2d 467; see OCGA § 15-11-94(b)(4)(B)(v); In the Interest of Z.H.T., 302 Ga.App. 424, 429(1)(a), 691 S.E.2d 292 (2010) (Current deprivation "may be established by showing that the conditions upon which an earlier finding of deprivation was based still exist[.]").
Ultimately, when this Court reviews a juvenile court's finding that a child is deprived,
we view the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the' appellate standard is not met.
(Citation and punctuation omitted.) In the Interest of R.M., 276 Ga.App. at 707-708, 624 S.E.2d 182. So viewed, the record shows the following facts.
At the time of the adjudication hearing at issue in this case, the mother was 30 years old and had never been married. She had a ninth grade education, had an IQ that indicated "borderline intellectual functioning," had only worked at low-wage, unskilled jobs for short terms a few times over several years, and had been receiving monthly disability payments and food stamps for several years. Between 1999 and 2007, she gave birth to four children as a result of relationships with three men, none of whom legitimated or financially supported their children. Beginning in 2004, the children were repeatedly removed from the mother's custody based upon evidence that the mother and/or other adults present in her home physically abused and neglected the children and that the conditions of the family's home presented health and safety hazards to the children. This evidence showed, among other things, that the mother had hit one of her children in *614 the face with a knife, cutting her; that the mother slapped, punched and violently grabbed two of the children; that the mother neglected the children's hygiene; that the mother improperly shook one of the children when he was two days old; that the mother had wrapped the same infant in a manner that could have interrupted his breathing; and that the mother had used illegal drugs. This evidence of physical abuse and neglect, combined with evidence that the mother failed to make any significant progress on court-ordered reunification plans and that, as the only legal parent of the children, she lacked the necessary skills, judgment, and resources to provide proper parental care to the children, convinced the Juvenile Court of Cobb County to terminate her parental rights to the children in August 2008.[1]
At some point in 2009, the mother began cohabitating with a man (hereinafter, the "putative father"), and, on December 24, 2009, she gave birth to a boy, R.B., the child at issue in this case. DFCS filed an emergency petition for temporary custody of R.B. based upon the facts recounted above, and the court granted the petition on December 28, 2009.
On June 3, 2010, the juvenile court conducted an adjudication hearing on the deprivation and nonreunification petition filed by DFCS. DFCS presented the expert testimony of a licensed clinical psychologist, who testified that she had met with the mother on February 4, 2010, and had conducted a psychological evaluation and an assessment of parental fitness. According to the psychologist, the mother reported that she had a history of sexual abuse and domestic violence, that she had a limited support system, that she had "employment issues," and that she had had her parental rights to other children terminated. The mother had a full scale IQ score of 72, which indicates that she has borderline intellectual functioning. As for the mother's ability to effectively interact with her environment, the psychologist found that the mother scored about 50, on a scale of zero to 90, on the day of her assessment. According to the psychologist, the mother had difficulty communicating what she wanted to say and sometimes did not make sense and, when the psychologist tried to get clarification, the mother would say that the psychologist just did not understand. During her testimony, the psychologist expressed concern as to whether the mother would be able to communicate her child's needs to others, such as the child's physicians and teachers.
Although the mother had taken parenting classes, the psychologist opined that the mother would have difficulty applying what she had learned to actual situations with a child. The psychologist testified that, when she questioned the mother about the appropriate way to respond or react in different parenting scenarios, the mother repeatedly indicated that she would question the child regardless of the child's ageas if she was looking for direction on how she should react. In fact, even when presented with scenarios involving a serious injury to the child or circumstances suggesting the child was emotionally troubled, the mother never indicated that she would take the child to a doctor or a counselor or seek assistance from an outside agency.
Finally, the psychologist testified that the mother gave "unrealistically positive" answers to an objective questionnaire, presenting herself as an unrealistically good and faultless person. While the psychologist was unsure whether the mother had purposefully lied to make herself "look good," she opined that the answers reflected the mother's lack of insight into her situation and her personal limitations. According to the psychologist, the mother appeared to believe that her other children had been taken away and her rights terminated through no fault of her own but, instead, because of the actions of other people. In fact, the mother was unable to show that she had a clear understanding of why her other children had been removed from her care, which concerned the psychologist because, if the mother did not know what she did wrong before, there was a greater chance that she would repeat it.
Based upon her evaluation of the mother, the psychologist opined that, even with parenting *615 and anger management classes, the mother's lack of cognitive capacity, communication skills, and cognitive flexibility rendered her incapable of ever learning the skills necessary to properly care for R.B.
The mother and the putative father of R.B. also testified during the adjudication hearing. The putative father testified that he had lived with the mother for approximately a year and that, during that time, the mother had punched him and had repeatedly yelled at him in the presence of his six-year-old son. He also testified that, a few days before the hearing, he discovered that the mother was in a relationship with another man, so he ended his relationship with her and moved out of their home. Moreover, the putative father expressed doubts about whether he was, in fact, R.B.'s biological father, and he admitted that he had not paid any financial support for or attempted to legitimate R.B. prior to the adjudication hearing.[2]
In response to the putative father's allegations, the mother explicitly denied having sexual relations with another man around the time she conceived R.B., and she insisted that the putative father was lying and that she was "99.9 percent" certain that he was R.B.'s biological father. As for why she was receiving monthly disability benefit payments, the mother was unable to offer an explanation, testifying only that her grandmother had "signed [her] up" for them when she was young. When questioned about whether her monthly income of $674 in disability payments and $154 in food stamps was sufficient to meet her expenses, the mother expressed confidence that she would be able to pay her expenses without moving or getting a roommate, noting that she hoped she would earn her GED and possibly get a job in the future so that she would no longer need the disability benefits. The mother also stressed that she just wanted to "live my life," "be happy," and "raise my babies" without "people saying stuff about me and calling me names." However, when asked what had changed in her life since her rights to her other four children had been terminated in 2008, the mother responded that she no longer lived with her mother and that she was now "on my own," even though she still had no job. Although little had changed in the past two years, the mother insisted that she loved R.B., that she needed to be with him, and that he needed to be with her, thereby suggesting that this was enough to justify his return to her custody. The court then asked her directly if she could tell him why she had lost her rights to her older four children; the mother simply responded that she did not know.
After hearing all of the evidence, the court found that R.B. was currently deprived due to the mother's inability to be an effective parent. Consequently, the court granted DFCS's deprivation petition and its motion to establish a case plan of nonreunification.
In arguing that the evidence was insufficient to support the juvenile court's conclusions, the mother argues that, other than the fact that her rights to her four older children had been terminated, there was no other evidence to show that R.B. would be deprived if returned to her custody. As shown above, however, the record does not support her argument. Further, the mother essentially asks this Court to override the juvenile court's decision by re-weighing the evidence presented and re-evaluating the credibility of the witnesses, which we will not do. In the Interest of R.J.D.B., 305 Ga.App. 888, 894(1)(a), 700 S.E.2d 898 (2010). As for the mother's claims that she has taken classes to improve her parenting skills and that she is pursuing her GED in an effort to improve her financial situation, it is for the juvenile court, not this Court, to decide what weight to give to these promised improvements. Id.
[J]udging the credibility of [the mother's] good intentions was a task for the juvenile court. Moreover, the juvenile court was authorized to consider the mother's past conduct in determining whether the causes of deprivation were likely to continue. And the decision as to a child's future must *616 rest on more than positive promises which are contrary to negative past fact.
(Punctuation and footnotes omitted.) Id. See also In the Interest of T.V., 302 Ga.App. at 127(1), 690 S.E.2d 457 ("Lack of stable housing and lack of support due to a parent's unstable or irregular employment are appropriate factors in determining deprivation. . . . In determining whether the parent's current situation is stable, the juvenile court may consider the parent's past conduct and decide, what weight, if any, is to be given to recent improvements in the parent's housing and employment circumstance.") (citations, punctuation and footnote omitted); In the Interest of D.D.B., 282 Ga.App. 416, 418-419(1), 638 S.E.2d 843 (2006) (accord).
Accordingly, we conclude that there was sufficient clear and convincing evidence presented to authorize the juvenile court to find that R.B. was currently deprived and that the deprivation was likely to continue, and, consequently, that reunification of R.B. with his mother would be detrimental to the child and was not in his best interest. In the Interest of A.R., 287 Ga.App. at 336, 651 S.E.2d 467; In the Interest of R.M., 276 Ga.App. at 707-708, 624 S.E.2d 182; see also OCGA § 15-11-58(a)(4)(C) (reunification efforts are not required when the parent's rights to a sibling of the child have been terminated involuntarily); In the Interest of CP., 291 Ga.App. 699, 699-700(1), 662 S.E.2d 802 (2008) ("Before terminating reunification services, a juvenile court must find by clear and convincing evidence that reasonable efforts to reunify a child with his or her family will be detrimental to the child.") (citation and punctuation omitted).
2. The mother contends that the State failed to present sufficient evidence to prove that Cobb County was the proper venue for the adjudication proceeding. We disagree.
OCGA § 15-11-29(a) provides that a juvenile proceeding "may be commenced in the county in which the child resides," or "[i]f deprivation is alleged, the proceeding may be brought in the county in which the child is present when it is commenced." Moreover, as to venue, it may be presumed as a matter of law, subject to rebuttal, that a child placed in the custody of a county department of family and children services thereafter assumes the residence of that county department.
(Punctuation and footnote omitted.) In the Interest of R.J.D.B., 305 Ga.App. at 896-897(2), 700 S.E.2d 898.
The undisputed evidence in the record reveals that the mother was residing in Cobb County when R.B. was born and when the underlying proceeding alleging deprivation commenced, and that R.B. remained in the custody of Cobb County DFCS through the time the juvenile court entered its deprivation and non-reunification order. Accordingly, the requirements for proving that venue was properly in Cobb County were met. In the Interest of R.J.D.B., 305 Ga.App. at 897 (2). There was no error.
Judgment affirmed.
MILLER, P.J., and DOYLE, J., concur.
NOTES
[1] This Court affirmed the termination order on December 4, 2009.
[2] DNA testing conducted shortly after the adjudication hearing revealed that the putative father was not, in fact, R.B.'s biological father. Consequently, he withdrew his petition to legitimate R.B., which he had filed immediately after the hearing, and he is no longer a party to any proceedings involving R.B.