662 S.E.2d 300 (2008)
In the Interest of J.R.N. et al. (two cases).
Nos. A08A0524, A08A0525.
Court of Appeals of Georgia.
May 14, 2008.
*301 David Leroy Whitman, Lawrenceville, for Appellant.
Thurbert E. Baker, Atty. General, Shalen S. Nelson, Senior Atty. General, Elizabeth M. Williamson, Asst. Atty. General, Victoria Wallace Wuesthoff, for Appellee.
PHIPPS, Judge.
The mother of five minor children appeals orders of the Juvenile Court of Gwinnett County finding the children deprived and terminating her parental rights. Case No. A08A0524 is her appeal from the termination order. Case No. A08A0525 is her appeal from the deprivation order. She complains of the court's admission of the results of two drug screens administered to her at the time of the deprivation hearing. She also challenges the sufficiency of the evidence to show harm to the children from any continued deprivation. Finding no basis for reversal, we affirm.
The five children (three girls and two boys) were taken into emergency shelter care in October 2004. At the time, they were aged four, six, seven, nine, and eleven. The precipitating cause for their removal from the home was physical abuse of one of the children by his father coupled with the father's physical abuse of the mother in the children's presence. In addition, the mother had allowed the physical abuse to continue by allowing the father back into the home through removal of a restraining order entered during a prior case investigation.
In November 2004, the Gwinnett County Department of Family and Children Services (DFCS) filed a plan for the reunification of the mother with the children. Among other things, the plan required the mother to attend and successfully complete psychological and psychiatric evaluations, parenting classes, and domestic violence classes.
As of November 2005, the children had been placed in foster homes. Two of the girls were doing well, one girl was having problems and the boys were having emotional or behavioral problems. The mother had completed a psychological evaluation, parenting classes, and an alcohol and drug assessment; she was attending relapse prevention classes weekly; and she was no longer living with the father. But she had not completed domestic violence classes, did not have stable housing, and had not provided adequate proof of employment. In November 2005, DFCS filed a motion for nonreunification, alleging that further efforts to reunite the children with their mother would be detrimental because she had not visited the children on a consistent basis and had failed to make substantial progress in their case plan.
The nonreunification action came before the juvenile court in January 2006. The parties stipulated that the mother had completed parenting classes, a domestic violence assessment, a psychological evaluation, family counseling, and most requested random *302 drug screens. She had also visited the children bi-weekly. But she was unemployed and did not have stable housing or sufficient income to provide for the children's needs. Based on a consideration of all these factors, the court entered an order relieving DFCS of responsibility for continuing efforts to reunify the mother with the children.
As of May 2006, the judicial citizen review panel found that the girls were doing well in foster care, that the boys' conditions were improving, and that all children were in therapy. Termination of parental rights and adoption were thus recommended as long-term goals.
In August 2006, the juvenile court conducted a review hearing at which the mother appeared. She testified that she was employed doing maintenance work, that she was living in an apartment provided by a municipal housing authority, and that she was visiting the children monthly.
In October 2006, DFCS filed a petition alleging that the children continued to be deprived and seeking a termination of the mother's parental rights. In the petition, DFCS alleged that although the mother had made progress on the reunification case plan, she had left the review hearing without taking an agreed-upon drug screen and had since evaded attempts by DFCS to verify her sobriety.
A deprivation hearing was held in December 2006. At that hearing, the mother admitted that she had begun using drugs and alcohol when she was as young as 11 or 12 years old; that, while together, she and the father had consumed alcohol, amphetamines, cocaine, and marijuana; that she had used drugs such as methamphetamine and marijuana within the past year; and that she used legal, over-the-counter drugs such as ephedrine to wean herself from other drugs and for energy.
At the deprivation hearing, Felicia Steverson, an intake officer employed by the Juvenile Court of Gwinnett County, performed a urine drug screen on the mother. The mother objected to admission of the results of the drug screen under Daubert v. Merrell Dow Pharmaceuticals[1] and on the ground that a proper foundation had not been laid by showing that the witness was adequately trained to perform the test and interpret the results. The witness testified that when she began her employment as an intake officer about 14 years earlier, a more senior officer had trained her to administer the test in accordance with the instructions provided in kits by the test manufacturers. And although she had been administering the particular test she was using that day for only about three or four years, it was used routinely and its results admitted in evidence in Gwinnett County and other jurisdictions. Based on the witness's testimony, the court overruled the mother's objection. The court then admitted a copy of the results of the urine screen showing positive readings for methamphetamine and amphetamine.
At the deprivation hearing, Timothy Garner, an employee of a urinalysis company known as New Hope Diagnostics, testified that beginning in August 2006, he had gone to the mother's house at least seven times to perform random drug screens at the request of DFCS. He had performed only one test. Although its results were negative, he was unable to perform any other tests because the mother was either at home and refused to answer the door or failed to contact him after being requested to do so in a card he had left at her home.
While Garner was on the stand, the hearing was adjourned so that he could perform urine and hair follicle tests on the mother that day. The mother, however, refused to provide a hair sample. And after the hearing resumed, she objected to admission of the results of the urine test on the same grounds that she had objected to the urine test performed by Steverson.
Garner testified that the urine test, manufactured by U.S. Diagnostic, Inc., is a preliminary screen designed to eliminate the necessity of proceeding with laboratory analysis if the sample tests negative. According to Garner, however, the results are "very accurate." Although Garner was not a laboratory technician and had received no formal training, *303 he administered the test in accordance with instructions provided by the manufacturer and was certified by a government agency as qualified to properly collect samples, follow custody-control procedures, package them, and send them to the laboratory. After the court overruled the mother's objection to admission of the results of the urine screen, Garner testified that the mother had tested positive for amphetamine but negative for methamphetamine.
In March 2007, the juvenile court entered an order of adjudication finding the children deprived. Among other things, the court found that the mother had an un-rehabilitated alcohol and substance abuse problem, that she had tested positive for a drug at the December 2006 hearing, that she had avoided numerous other court-ordered drug screens, and that she had failed to provide any monetary support for the children. The court found that the drug tests administered at the hearing provided circumstantial evidence of drug usage, but were not necessary to support the court's inference that the mother had a drug problem due to her continued refusal to submit to other tests.
In April 2007, a trial was conducted on DFCS's petition for termination of the mother's parental rights. At the hearing, the mother testified that she was self-employed; that although she attended AA or NA meetings occasionally, she had been drinking as recently as a few weeks earlier and, within the past year, had used drugs not legally prescribed for her; but that she did not think she was an alcoholic or had a drug problem. Garner testified that since the deprivation hearing, he had gone to the mother's house four times but had been unable to obtain any drug screens. On one of those occasions, the mother had been at home but had refused to submit to screening. Cynthia Shackleford, the mother's DFCS case manager, testified that the children had been in foster care for almost three years and were in need of permanency in their lives and a stable home; that they all remained in therapy; that the anxiety they were experiencing as a result of the uncertainty of their status was harming them academically and emotionally; that it would thus be detrimental to their welfare if they were required to linger in foster care; that prospective parents with whom she deals prefer to adopt children whose parents' rights have already been terminated; that one of the foster families with whom the girls were placed was interested in adopting them; that another family interested in adopting all five children was making constant inquiries as to whether the rights of the parents had been terminated; and that DFCS would thus have a better chance of finding a permanent placement for them following a termination of parental rights.
In June 2007, the court entered an order terminating the mother's parental rights to her five children. Among other things, the court drew a negative inference from her refusal to submit to drug screening and found her chargeable with un-rehabilitated drug abuse. The court also found that by failing to maintain a bond with the children in a meaningful and supportive manner, by failing to maintain stable housing or employment, and by failing to address her substance abuse issues, she had failed significantly for a period of one year or longer to comply with the court-ordered reunification case plan. The court thus found her unready and unable to care for the children. The court further determined that their continued deprivation would seriously harm them, finding that they had received stability in foster care, that they were experiencing anxiety due to their uncertain custody status, and that a lack of permanency would have a detrimental effect on them.
1. The mother complains of the court's admission of the results of the drug tests at the deprivation hearing.
In view, however, of the court's reliance on other evidence to support its findings as to continuation of the mother's drug problems, she has failed to show that she was harmed by admission of the results of the drug tests.[2] In addition, urinalysis "is a medically accepted and widely used method *304 of drug testing."[3] "Once a test has obtained scientific acceptance, the court may rely on it and those who challenge it must produce evidence to support their objections."[4] And although neither Steverson nor Garner had received formal training from manufacturers of the tests, Steverson's longtime practical experience in administering the test and Garner's government certification provided some basis for the trial court's determination that they were qualified to testify about the test results.
2. The mother charges the court with error in finding that the continued deprivation of the children would result in harm to them.
Termination of parental rights involves a two-step procedure:
First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[5]
On appeal from an order terminating parental rights, this Court reviews the evidence in the light most favorable to the juvenile court's disposition to determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. In making this review, we neither weigh the evidence nor determine the credibility of witnesses, but instead defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.[6]
Although we have previously held that the same evidence used to support a finding that the cause of the deprivation is likely to continue may support a finding that continued deprivation would cause serious physical, mental, or moral harm to the children,[7] "it is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child. Otherwise, the fourth part of the test would have no meaning."[8]
Thus, in In the Interest of J.T.W.,[9] we found insufficient evidence to support the trial court's conclusion that continued deprivation would likely cause serious harm to the child, where domestic violence inflicted on the mother had not been witnessed by or affected the child, the mother was providing adequate care for another child at the time her parental rights to the child at issue were terminated, the child was doing well in foster care, and there did not appear to be any prospects for adoption. And in In the Interest of T.P.,[10] the state failed to present evidence as to the effect that continued deprivation would have on the child, where there was no lay or professional testimony that the child was then suffering physical, mental, emotional or moral harm, and there was evidence that the mother was capable of providing adequate care for herself and the child, albeit in a supervised independent living arrangement.
*305 In cases such as In the Interest of M.C.[11] and In the Interest of A.R.A.S.,[12] we have held, however, "that where evidence shows no parental bond between parent and child, the child has adapted well to foster care, and the foster parents wish to adopt, this is sufficient to support the conclusion that continued deprivation is likely to harm the child."[13] Conversely, "the court is `authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm' to the child."[14] And in cases such as In the Interest of M.C.[15] and In the Interest of J.S.T.S.,[16]
[w]e have held that evidence of a (parent's) repeated failure to remain drug free and [her] failure to take the steps necessary to reunite with the children was sufficient to prove that the continued deprivation would cause the child serious physical, mental, emotional, or moral harm. Additionally, it is well settled that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems.[17]
Here, the evidence authorized the juvenile court to find that the mother had failed or proved unable to remain drug free and take other steps necessary to reunite herself with the children. There was also evidence that the children were suffering emotional harm because of the indeterminate nature of their current situation, that there were reasonable prospects for adoption, and that those prospects would be significantly enhanced if the mother's parental rights were terminated.[18] These facts distinguish cases such as J.T.W. and T.P. and bring this case more in line with cases such as M.C., A.R.A.S., and J.S.T.S. In sum, the evidence supports the trial court's finding that the children's continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to them.
Judgment affirmed.
BARNES, C.J., and JOHNSON, P.J., concur.
NOTES
[1] 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[2] In the Interest of T.J., 281 Ga.App. 673, 676(2), 637 S.E.2d 75 (2006); see Tutton v. State, 179 Ga.App. 462, 463(2), 346 S.E.2d 898 (1986) (trial court presumed to separate wheat from chaff).
[3] People v. Nolan, 95 Cal.App.4th 1210, 1214, 116 Cal.Rptr.2d 331 (Cal.App.2d Dist.2002) (citation omitted).
[4] Id. at 1215, 116 Cal.Rptr.2d 331 (citation omitted).
[5] In the Interest of J.T.W., 270 Ga.App. 26, 32-33(2), 606 S.E.2d 59 (2004) (citation and punctuation omitted).
[6] In the Interest of T.P., 270 Ga.App. 700, 608 S.E.2d 43 (2004) (citation omitted).
[7] E.g., J.T.W., supra at 36-37(2)(d), 606 S.E.2d 59.
[8] Id. at 37, 606 S.E.2d 59 (footnote omitted); In the Interest of J.K., 278 Ga.App. 564, 573, 629 S.E.2d 529 (2006) (Ruffin, C.J., concurring specially).
[9] Supra.
[10] Supra 270 Ga.App. at 706(4), 608 S.E.2d 43.
[11] 287 Ga.App. 766, 653 S.E.2d 120 (2007).
[12] 278 Ga.App. 608, 629 S.E.2d 822 (2006).
[13] M.C., supra at 769-770(1)(d), 653 S.E.2d 120 (citation and punctuation omitted); A.R.A.S., supra at 615(2)(d), 629 S.E.2d 822 (citations omitted).
[14] In the Interest of D.L.T., 283 Ga.App. 223, 228(2), 641 S.E.2d 236 (2007), citing In the Interest of A.K., 272 Ga.App. 429, 438(1)(d), 612 S.E.2d 581 (2005); see also In the Interest of K.S., 250 Ga.App. 386, 389-390, 552 S.E.2d 441 (2001) (upon considering best interest of child, juvenile court authorized to consider child's need for stability and harmful effects of prolonged foster care).
[15] Supra.
[16] 273 Ga.App. 221, 225-226, 614 S.E.2d 863 (2005).
[17] M.C., supra at 770, 653 S.E.2d 120 (citation and punctuation omitted); J.S.T.S., supra at 225-226, 614 S.E.2d 863 (punctuation and footnote omitted).
[18] Compare J.T.W., supra (fact that a parent is unemployed and without stable living arrangements not sufficient to terminate parental rights).