

YALE LAW LIBRARY

A08A0953, A08A0954, A08A0955. IN THE INTEREST OF A. A. et al., children (three cases).

(667 SE2d 641)

ADAMS, Judge.

In separate appeals, the mother and father of A. A. and N. A. appeal the juvenile court's finding that the children are deprived and the father appeals the denial of his petition to legitimate the children. We affirm.

"On appeal from a juvenile court's order finding deprivation, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the [child was] deprived." (Punctuation and footnote omitted.) *In the Interest of G. G.*, 253 Ga. App. 565 (560 SE2d 69) (2002). "We neither weigh evidence nor determine the credibility of witnesses." (Footnote omitted.) Id.

Construed in favor of the finding of deprivation, the evidence shows that the mother and father are not married but have had three children: J. A. (born in 2001 or 2002), A. A. (born August 8, 2004), and N. A. (born January 12, 2006). The present case involves the younger two children. The parents' rights to J. A. had been terminated previously based on physical abuse that occurred when the child was seven months old.[1] In connection with that event, the mother was convicted of cruelty to children and the father was convicted of aggravated assault and cruelty to children. As of July 18, 2007, the time of the deprivation hearing in the present case, both

---

[1] Certified copies of orders from the file on J. A. were admitted.

parents had been on probation as a result. Their probation was apparently revoked based on the new allegations because both parents were incarcerated at the time of the deprivation hearing in this case.

With regard to the present matter, the evidence shows that on April 6, 2007, the father snatched N. A., then 15 months old, out of the bathtub with enough force to injure her shoulder. The mother took the child to Egleston Hospital in Atlanta for treatment, but no fracture was detected. The child was otherwise normal and healthy at this time.

On April 11, the mother took the child to Scottish Rite Hospital with an unexplained serious injury. Medical examination revealed that although the child did not have any physical injuries on her head or face, she had a severe, life-threatening brain injury together with subdural bleeding — underneath her skull but outside her brain — on both sides and some bleeding in the backs of her eyes. Doctors had to remove a part of the skull to relieve pressure from swelling; parts of the child's brain are "dead"; and it is expected that the child will have some permanent brain injury. Dr. Jordan Greenbaum, who examined the child and who was admitted as an expert in child abuse, testified that the cause of the head injuries was traumatic, possibly from the child having been shaken, with or without the child's head hitting something. The nature of the injuries together with no report of an accidental trauma or disease led the expert to conclude that "to a reasonable degree of medical certainty . . . this represented abusive head trauma." Based on information the doctor obtained from the grandmother and mother, the doctor estimated that the head injury occurred between 10:00 p.m. on April 10 and 11:30 a.m. on April 11. Finally, the medical examination also revealed that the child's right upper arm had been fractured near the shoulder in a manner that is typically caused by abuse associated with "excessive force or a really hard yank or jerk." Dr. Greenbaum testified that the fracture would have been hard to diagnose at the time of the injury.

Testimony from several witnesses established that at the time of the injuries, several people resided at the family home including the two children, their parents, the grandmother, a paternal uncle, and two other people. The uncle was about 18 or 19 years old at the time, and he often babysat for the children. At night he slept on the floor in the mother's room, and the two children slept in their mother's bed with her.

On the evening of April 10, the children went to bed with their mother at about 10:00 p.m.; the grandmother went to bed in a separate room and took a sleeping pill. The father, who did not live in the home on a full-time basis, slept on the couch when he returned

from work that night at about 1:00 a.m. N. A. was fine when she went to bed but would not wake up the next morning at about 11:00 a.m. when the grandmother awoke. The parents had left for work between 7:30 and 8:40 a.m., and, after that time, the children would have been in their uncle's care. By 2:30 or 3:00 p.m., the grand-mother noticed that N. A. was groggy and had a fever. The grand-mother became concerned and asked the uncle to call the mother. Later, she herself contacted the mother, who indicated that she was going to bring home some medicine that she had been instructed to get based on a telephone call that she had made. When the mother returned home at 8:00 p.m., the baby was still asleep, would not wake up, and was making a mumbling noise. The mother then twice called a nurse hotline operated by Children's Health Care of Atlanta and was told to take the child to the hospital, which she did. Children's Health Care operates both Egleston and Scottish Rite children's hospitals.

At the deprivation hearing, both the mother and father pled the Fifth Amendment in lieu of answering questions about the cause of the child's head and arm injuries as well as questions about the prior events regarding J. A. But several witnesses testified to statements they made during the investigation, in which the parents gave two inconsistent stories about the events of the evening. Both parents told Dr. Greenbaum and a caseworker from the Department of Family and Children Services (DFACS) that the child had slept through the night without incident in the mother's bed. The father told the doctor that he had come home at 1:00 a.m., when everyone else was asleep, and that he slept on the couch and had no contact with the child. But both the mother and father told a detective and a separate DFACS special investigator that N. A. woke up crying at about 3:00 a.m. and the father came and got her and brought her into the living room to sleep with him on the couch. The father then brought the child back into the bedroom around 7:40 a.m., and the parents both went to work. Under both versions of their stories, the parents denied any knowledge of how the child had been injured.

Finally, the DFACS special investigator testified that due to the severity of N. A.'s unexplained injuries, the children would not be safe if they were returned to the home.

Following the hearing, the juvenile court found clear and con-vincing evidence that A. A. and N. A. were deprived, and the court awarded custody to DFACS. The court postponed ruling on the father's petition to legitimate the children at that time, but at a subsequent hearing the court denied the petition. In Case No. A08A0953, the father appeals the order finding deprivation, and in Case No. A08A0954, he appeals the denial of his petition to legiti-

YALE LAW LIBRARY

mate. In Case No. A08A0955, the mother appeals the order finding deprivation. We have consolidated the three cases for the purposes of appeal.

1. Both parents contend the evidence was insufficient to support the finding of deprivation. A child is deprived if he or she "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." OCGA § 15-11-2 (8) (A). This definition focuses upon the needs of the child regardless of parental fault:

> "The petition is brought on behalf of the child and it is (the child's) welfare and not who is responsible for the conditions which amount to deprivation that is the issue." *Brown v. Fulton County [Dept. of] Family &c. Svcs.*, 136 Ga. App. 308, 310 (2) (220 SE2d 790) (1975).

*In the Interest of J. P.*, 267 Ga. 492 (480 SE2d 8) (1997). "The juvenile court's primary responsibility is to consider and protect the welfare of children whose well-being is threatened. OCGA § 15-11-1 (1)." *In the Interest of B. H.*, 190 Ga. App. 131, 133 (1) (378 SE2d 175) (1989).

Here the child suffered a traumatic, unexplained, life-threatening injury while in the primary care of the mother and father, who have a history of abuse with another child, for which the parents were incarcerated. They took N. A. to two different hospitals within the same week in response to two injuries that resulted from use of excessive force, one of which is clearly attributed to the father. They told two different stories about the events surrounding the head injury, and they refused to testify at the hearing. Although a parent may plead the Fifth Amendment in juvenile protection proceedings, if a parent does so, "the trial court may infer that a truthful answer would be harmful." (Footnote omitted.) *In the Interest of M. V.*, 253 Ga. App. 669, 672 (560 SE2d 125) (2002). See also *In the Interest of S. B.*, 242 Ga. App. 184, 186 (1) (528 SE2d 278) (2000). Although the child was in the uncle's sole care for three or more hours on the morning of April 11, there is no evidence that the child was behaving normally at the time the parents went to work and thus no evidence to eliminate the possibility that the child had already been injured. Also, the fact that the mother may have responded reasonably in the face of the child's injuries does not take away from the fact that the child was physically abused by someone while in the care and control of the parents. *In the Interest of J. V.*, 241 Ga. App. 621, 626 (526 SE2d 386) (1999). We hold that any rational trier of fact could have found by clear and convincing evidence that the children were deprived. See, e.g., id. (deprivation

finding affirmed where child suffered unexplained, serious injuries while with either the mother, father, or grandparent even though mother was loving and otherwise provided for the child); *In the Interest of T. J.*, 273 Ga. App. 547 (615 SE2d 613) (2005) (deprivation finding affirmed where mother was evasive about child's serious, unexplained injuries even though conflicting expert testimony was presented as to the cause of the injuries); *In the Interest of M. V.*, 253 Ga. App. at 671. See also OCGA § 15-11-94 (b) (4) (B) (iv) ("Egregious conduct or evidence of past egregious conduct of the parent toward the child or toward another child of a physically, emotionally, or sexually cruel or abusive nature" may be considered when determining whether the child lacks proper parental care and control).

2. The father contends the juvenile court erred by allowing the State to call an expert witness without identifying her as an expert or producing the medical records in advance of the hearing. First, the father's discovery request did not ask the State to identify each person whom it expected to call as an expert witness at trial; rather, it simply sought identification of witnesses, and the State complied. But pretermitting whether the State's pre-trial identification of the expert was sufficient, the father has not shown how he was prejudiced by lack of any additional information other than a broad assertion that he did not have sufficient time to prepare for the hearing. "It is axiomatic that harm as well as error must be shown to authorize a reversal by this court." (Punctuation and footnote omitted.) *Albarran v. State*, 249 Ga. App. 331, 334 (4) (548 SE2d 440) (2001). See also *In the Interest of J. H.*, 273 Ga. App. 424, 427 (615 SE2d 231) (2005).

3. The father contends the juvenile court abused its discretion by allowing the State to introduce the prior orders involving J. A. without notice and without having provided copies of the relevant orders. Again, however, the father does not even attempt to show how he was harmed. Although he states that the juvenile court included facts from these documents in its order finding deprivation, the father does not show or explain how the information was harmful in light of the other evidence presented. Moreover, "a trial court may take judicial cognizance . . . of records on file in its own court." *Petkas v. Grizzard*, 252 Ga. 104, 108 (312 SE2d 107) (1984). See also *In the Interest of A. B.*, 285 Ga. App. 288, 289 (645 SE2d 716) (2007) (juvenile court took judicial notice of prior proceedings involving appellant and her other two children and used them to support finding of deprivation). We find no reversible error.

4. One week after the children were placed in the temporary custody of DFACS, the father petitioned to legitimate A. A. and N. A. The mother consented to the petition. The trial court eventually

determined that the father was not a fit parent and denied his petition for legitimation. On appeal the father contends that because the mother consented to the petition, the juvenile court lacked the discretion to deny the petition. He argues that because it is undisputed that he did not abandon his opportunity interest to develop a relationship with the child, he has or should have the same rights as the mother unless and until a court determines that his parental rights should be terminated.

In ruling on a petition to legitimate a child when the father has not abandoned his opportunity interest to develop a relationship with the child, one of two tests is employed:

> . . . depending on the nature of the biological father's relationship with the child and other surrounding circumstances, the standard for evaluating whether legitimation is appropriate is either a test of his fitness as a parent or the best interest of the child.

(Punctuation and footnote omitted.) *Binns v. Fairnot*, 292 Ga. App. 336-337 (665 SE2d 36) (2008). Unlike the best interest test, a hearing on parental fitness provides substantial protection of the parent's due process rights under the United States Constitution. *In re Baby Girl Eason*, 257 Ga. 292, 295-297 (1) (358 SE2d 459) (1987). The juvenile court appropriately applied that test to this case. See generally *Bowers v. Pearson*, 271 Ga. App. 266, 269-270 (609 SE2d 174) (2005). Finally, "[w]e review a trial court's ruling on a legitimation petition for abuse of discretion." (Footnote omitted.) *Binns v. Fairnot*, 292 Ga. App. at 337. We find no abuse of discretion here. Based on the same evidence shown above, the juvenile court was authorized to conclude that the father was not a fit parent and therefore not entitled to legitimate the children.

*Judgments affirmed. Smith, P. J., and Mikell, J., concur.*

DECIDED SEPTEMBER 2, 2008.

*Phillip Jackson*, for appellant (case nos. A08A0953 and A08A0954).

*Hollowell, Foster & Gepp, Jolanda E. Herring*, for appellant (case no. A08A0955).

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General*, for appellee.