A10A1110. IN THE INTEREST OF D. B. et al., children.
(701 SE2d 588)

PHIPPS, Presiding Judge.

The biological father of D. B., Q. B., and twins Jas. B. and Jal. B. appeals the termination of his parental rights to all four children, challenging the sufficiency of the evidence. Because the father has presented no meritorious argument, we affirm.

OCGA § 15-11-94 sets forth the relevant procedure for termination of parental rights and involves two steps.

> First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[1]

This court views the evidence in the light most favorable to the juvenile court's ruling to determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated.[2]

The record shows that the father and the children's mother lived together from 1995 until 2003, during which time their four children were born. The children — all boys except Jas. B. — lived with the couple, who did not marry, and when the mother moved out, she took their four children with her. For about three years thereafter, the father admittedly had no contact with the four children and did not know where they were.

During those intervening years, the mother married someone else and gave birth to a boy, J. H.[3] Thereafter, in August 2005, the five

---

[1] *In the Interest of J. R. N.*, 291 Ga. App. 521, 525 (2) (662 SE2d 300) (2008) (footnote omitted).

[2] *In the Interest of T. J. J.*, 258 Ga. App. 312, 314 (574 SE2d 387) (2002).

[3] The mother's husband was the legal father of that child.

130

children were removed from their home with their mother and her husband. D. B. was then eight years old; Q. B. was seven; twins Jas. B. and Jal. B. were five; and J. H. was one year old. The children had been brought to the attention of the Department of Family and Children Services (DFCS) when their teachers reported that they were stealing food. An investigator had thus gone to the children's home.

Based on information presented to it, the juvenile court placed all five children in DFCS's shelter care. It found, inter alia, that the children were living in a crowded, filthy house with no sheetrock on the bedroom walls; that four of the children were sleeping in one bed; that there was insufficient food and no eating utensils in the house; and that the house held a powerful and pervasive stench of urine.

DFCS filed a deprivation petition with respect to the five children. After a hearing, at which the mother and her husband stipulated that the children were deprived, the court so adjudicated them in September 2005, citing their crowded, filthy, unsafe, and otherwise unsuitable home conditions. Temporary custody was continued in DFCS. And the mother and her husband entered into reunification case plans with respect to the children.

In July 2006, DFCS filed a petition alleging that the children remained deprived. This petition alleged further that the biological father of the four oldest children — because he was never married to their mother and had taken no steps to legitimate the children — had failed to prevent the children's deprivation and had therefore contributed to the children's deprivation. The biological father of the four oldest children appeared at the hearing thereon in August 2006. Based upon evidence presented at that hearing, the juvenile court extended earlier rulings it made in its initial deprivation order, including continuing DFCS's custody of the children.

Despite being aware of his children's situation by August 2006, the father did not contact DFCS until February 2007. And although legitimation was discussed at that time, he did not file a petition to legitimate then ten-year-old D. B., eight-year-old Q. B., and seven-year-old twins Jas. B. and Jal. B until May 9, 2007. With the children's mother's consent, the juvenile court granted the legitimation petition that same day. A reunification case plan was created for the father, who by that time had stated that he was willing to have all five siblings placed in his home. His case plan included goals pertaining to visitation with the children and a favorable home evaluation.

In July 2007, the court granted DFCS's request to change the case plans of the mother and her husband to nonreunification because they had not complied with their reunification case plans. DFCS then filed a petition, alleging that the children remained

deprived and also citing that the court had authorized nonreunification case plans for the mother and her husband. DFCS noted therein that the father of the four oldest children was a possible placement for all five siblings. After a hearing, the court ruled that the children remained deprived and continued custody of them in DFCS. Further, the court set a date for a hearing to assess the progress of moving the sibling group into the home of the father of the four oldest children.

At that time, the father, his fiancée, and her three children were living in a three-bedroom mobile home. A DFCS counselor conducted a home evaluation and determined that there was insufficient furniture to accommodate five additional children. Thus, DFCS assisted the father with $1,800 worth of furniture to put into the residence so that the five children could be placed there. The counselor eventually gave the home a favorable evaluation.

But a significant issue remained concerning adequate space and supervision. Reports had surfaced concerning sexual misconduct involving D. B. and Q. B. By August 2007, D. B. and Q. B. were undergoing psychosexual counseling sessions at a counseling institute. Based upon evidence presented at the September 2007 hearing to ascertain any progress pertaining to moving the children into the home of the father, the court found that D. B. and Q. B. had been "sexually acting out and they need[ed] to learn boundaries before initiating unsupervised overnight visits." Consequently, while granting the father unsupervised overnight visits with the younger three children, the court allowed for only unsupervised day visits with D. B. and Q. B.

But soon after visitations began in September 2007, additional problems flared. The father missed about half the scheduled visitations (until termination later appeared imminent and he began to appear more regularly). In addition, the children sometimes returned to their foster mothers' homes very hungry and very dirty; the foster mothers were outraged and complained to the caseworker. After a November 2007 hearing to assess whether progress was being made with respect to moving the sibling group into the home of the oldest children's father, the court noted in an order that "there are concerns regarding the hygiene of the children during the visits with the father . . . which need to be addressed."

Thus, in February 2008, the father's case plan was amended to add that he would "address and resolve all documented concerns brought up in court" and that he would "attend psychosexual counseling appointments at the [counseling institute] for [D. B. and Q. B.]. If [he] cannot attend the appointments, at a minimum, telephone calls to the boys' counselor . . . need to be made."

But during the following months, the father made no attempt to attend his boys' psychosexual counseling appointments, which at

that time were scheduled for once a week; moreover, visitation problems continued. DFCS filed a petition in June 2008 alleging that the five children remained deprived. This time, DFCS alleged further that the father lacked appropriate parenting skills to adequately care for and supervise the children and that he was not cooperating with DFCS.

The juvenile court ruled that the five children remained deprived and extended DFCS's custody. In its order filed August 27, 2008, the juvenile court noted that it had held a hearing on DFCS's petition on August 13, at which the father was present. The court further noted in that order that there had been "insufficient compliance with the case plan on the part of the father." For example, the court determined, while it had become "crucial" for the father to become involved in his boys' counseling, he had avoided doing so; and, on more than one occasion, the father had ceased unsupervised visitations. The court noted DFCS's intent to petition for termination of parental rights. The record reveals that only after the August 13 hearing that precipitated this order did the father finally go to the counseling institute — indeed, twice in about a one-week period, but then he never went back.

Having determined that there was little or no progress being made as to any of the three parents, DFCS filed in October 2008 a petition to terminate the mother's parental rights to her five children, her husband's parental rights to J. H., and appellant's parental rights to the four children he had legitimated. Regarding the appellant, DFCS alleged that he had failed to comply with court-ordered plans designed to reunite him with his children.

At the termination hearing in March 2009, the mother's husband consented to the termination of his parental rights to J. H. The hearing proceeded with respect to the parental rights of the children's mother and the father of the four oldest children, after which the mother's parental rights to the five children were terminated, as well as the mother's husband's parental rights to J. H. With respect to the father, the following evidence was adduced.

The therapist who had provided individual counseling for D. B. and Q. B. from August 2007 until December 2008 testified that both boys were in counseling due to inappropriate sexual behavior. She described that behavior and said that, in about June 2008, the boys began disclosing sexual experiences with each other and with one of the younger children, Jas. B. D. B. initially denied the reports of his younger brother Q. B., but eventually said that the incidents had occurred. D. B. stated that he had seen his mother and her husband engaged in sexual activity and had viewed pornography on a television set in their home.

The therapist reported that the father did not attend any

counseling session until late August 2008, when the boys had already been in therapy for a year. On August 21, he met with the therapist for an informational session; about a week later, he appeared for a counseling session with the two boys. He told the therapist that he wanted the boys to know that he had done all he could do to avoid the termination of his parental rights, which by that time appeared imminent. The therapist testified that she discussed with the father D. B.'s and Q. B.'s sexual interactions. After the counseling session, however, she determined that at that point in the boys' counseling, their father's presence interfered with their progress, particularly given their long-withheld, but recent disclosures. She advised the father that she would call him if he was needed at another session. Although he called her once a month from September through December to inquire whether he was needed, she told him that he was not. He attended no other counseling session. The therapist testified that D. B. and Q. B. would need ongoing counseling. As of the hearing, the boys were continuing their counseling, albeit with another therapist at the counseling institute.

The DFCS caseworker recounted that she had met at least twice with the boys' father to discuss their sexual behavior. She testified that she had explained to him that "they were acting out in their foster home, they were touching each other inappropriately, and we . . . laid everything out on the line." According to the caseworker, the father replied, "Boys will be boys," and otherwise "minimize[d]" the situation. The caseworker testified that the father had not acknowledged that his two sons had severe sexual issues and that he had not prepared himself to protect them from harming each other or from harming the other children. According to the caseworker, DFCS had done all it could do to assist the father; she believed that the father's pattern of inconsistency would persist and that his children, meanwhile, needed and deserved permanency.

A counselor who had provided other services for the father testified about a similar response that the father had given her. She testified that when she discussed with him reports of sexually inappropriate behavior among his children, he reacted nonchalantly and maintained that such conduct had never happened while his children were with him.

Some of the children's foster mothers testified at the termination hearing about visitation and other matters. The twins' foster mother for about three years, who had also been J. H.'s foster mother since August 2008, testified that the three children called her "Grandmama" and were doing well in her home. She also had three other children living in her home, teenagers, whom she had adopted. The foster mother testified that the twins and J. H. interacted well together, as they did with her other three children. She testified that

she was capable of raising the twins and J. H. and that she was interested in adopting them.

According to this witness, the father had not been diligent in maintaining visitations with the three children. She could recall only about three times that he kept the full scheduled visitation. There were times, she recalled, that he accepted the children for overnight visits, but sent them back to her around midnight of the day they left. She also recalled occasions that the children were dropped off hungry; their faces had not been washed; and their hair had not been combed. The foster mother who had cared for J. H. from March 2006 through May 2008 testified to similar facts regarding the appellant's ability to care for that child and his failure to follow through with scheduled visitations.

D. B. and Q. B. had been placed in separate therapeutic foster care homes for treatment.[4] Q. B.'s foster mother since September 2007 testified that Q. B. was doing well in school, was continuing in his counseling sessions, and doing "great" overall. She testified that she had the capacity to adopt Q. B., and was willing to do so. She reported further that Q. B. maintained a relationship with D. B. and that they spent time together during scheduled visits and at other functions such as birthday parties. She was aware of their history and testified that their time together had always been supervised. She testified that she would like to see the brothers together, that she had been a therapeutic foster parent since 2001, that she believed that she could provide stability for them, and that she was willing to allow D. B. to be placed in her home.

The father also testified at the hearing. He acknowledged that, after the children's mother moved out of their home with their children in 2003, he did not know where his children were and had no contact with them for about three years. In July 2006, he discovered that his children had been in DFCS's custody since August 2005. He pointed out, however, that since about 2004, child support payments had been taken out of his paychecks. He had been employed for the six months leading up to the termination hearing, working 40 hours each week. He had been terminated from a prior job for missing too many days, which he attributed to the numerous court dates.

The father recalled that visitations with the children had begun in September 2007; he admitted that by November, because of problems with timing and transportation and an illness of one of the children, he "asked to stop" the unsupervised visitations. He ex-

---

[4] The caseworker referred to D. B.'s therapeutic foster parent during her testimony, but that foster parent was not called to testify.

plained that he "didn't know what was going on" and wanted to wait "to see what the judge [would say]." He recalled there were no visits during the following December, January, and February.

The father acknowledged knowing as early as January 2008 that DFCS wanted him to attend counseling sessions with his children. He acknowledged that doing so had been added to his case plan in February 2008. When asked at the hearing why he did not go until August 2008, he gave the following responses: no one had ever specified to him what was occurring amongst his children; no one fully advised him of the seriousness of his children's sexual activity; "they skimmed over it"; no one told him that he *had* to, and had someone told him that his attendance was required, he would have gone. Nevertheless, the father insisted that he took his children's sexual problems seriously and that he would do everything he needed to do to make sure that all of his children received whatever they needed.

The court continued the matter as to the father and allowed him unsupervised weekend visitations with the four youngest children and unsupervised day visits with D. B.

But when the counseling institute discovered that Q. B. would thus have unsupervised overnight visitations, it adamantly disapproved. It pointed out that the father was still not attending the boys' counseling sessions and had not incorporated any safety precautions in his home to facilitate unsupervised visitations. Thereafter, the institute developed a safety plan that, among other things, called for: a separate bedroom for each child; the installation of an alarm on each child's bedroom door that would sound if opened; a conference with an institute counselor, the father, his live-in fiancée, and the other children so that everyone in the home would be aware of the possibility of a child sexually acting out and how to protect him- or herself; and unannounced visits by the institute's personnel to the father's home.

On April 16, the father agreed to the safety plan. The following week, the father and his fiancée met with an institute counselor. He installed an alarm on the children's bedroom door. He financially could not, however, move to a larger residence that would allow for each child to have his or her own bedroom.

When the hearing reconvened in May 2009, the institute's director testified as an expert that "[p]utting children who are sexually active ... back with children who they have already assaulted is a recipe for disaster." She opined that Q. B. was a threat also to the younger children. The director feared that Q. B. would eventually act out on his younger siblings and testified that if Jas. B. did not receive treatment, she too might begin to act out. The director testified that she had never worked directly with any of the

children, however, and that her conclusions stemmed from the reports of others, including DFCS workers and therapists who had been involved in the case.

Also reported at the May 2009 hearing was that the father's fiancée and her children had moved out of the father's home. The electrical power there had been turned off for about a week due to an unpaid bill. And when the younger three children had meanwhile come over for their overnight visitation, the four of them spent the night at a motel — to "keep them comfortable," the father testified.

At the end of that hearing, the juvenile court suspended unsupervised visitations of any kind with any of the children, ordered an evaluation for Jas. B., and scheduled the hearing to reconvene thereafter.

When the hearing reconvened in June 2009, the director testified that she had conducted a psychosexual evaluation of Jas. B. on May 20, 2009 to assess her needs, in light of indications that her brothers had had sexual relations with her. The director reported that Jas. B. was "very protective of her brothers," but did report sexual misconduct by Q. B. The director described Jas. B. as a "very anxious child" who had "become trauma bonded with the perpetrators and she want[ed] to protect them rather than give information that may make them look bad." The director recommended that Jas. B. have no contact with her brothers Q. B. and D. B.

At the end of that hearing, the juvenile court terminated the father's parental rights to his four children. The court specifically noted that the father had maintained no relationship with his children for the several years before they came into foster care, that the father's life for years had continued in a pattern of "washing back and forth," that the father generally had been content to let others take care of the children, and that he had never offered a stable and appropriate home for them. Thus, the court determined that the father had failed to comply with the court ordered case plan that required him to establish a safe and stable home for his children. The court also noted that nearly four years had passed since the children had been removed from the home of their mother and her husband and that the children needed permanency.

1. The father does not challenge the juvenile court's findings that his children were deprived as alleged in the termination petition[5] or that the lack of proper parental care or control was the cause of the deprivation. The father argues instead, inter alia, that there was not sufficient evidence to show that the deprivation was

---

[5] The father further acknowledges the several prior deprivation orders, which were not appealed.

likely to continue and would not be remedied. He asserts that, by early 2008, he had substantially completed his case plan, designed for him to be reunited with his children. He points out that he legitimated his children, obtained a favorable home evaluation, paid child support, and maintained stable housing and employment. He concedes, however, that he "delayed too long in making his first appointment with [the boys' counselor] and had no adequate excuse for not doing so." However, he refutes the notion that he had not taken seriously D. B.'s sexual misconduct, pointing out that when he eventually went to the counseling institute, the boys' therapist told him his attendance at the sessions was no longer needed. Furthermore, he asserts that the record is unclear whether he was ever given details of what D. B. had done to his siblings and credits himself for purchasing and installing an alarm on the children's bedroom door and for attending with his fiancée a meeting with the institute's director.

Essentially, the father is asking this court to reweigh the evidence and reevaluate the credibility of witnesses, which we will not do.[6] While the record does show the father's efforts to comply with some aspects of the case plan, what weight to give that evidence was a question for the trier of fact.[7] Likewise, "[j]udging the credibility of [his] good intentions was a task for the juvenile court."[8] Moreover, the juvenile court was authorized to consider the father's past conduct in determining whether the causes of deprivation were likely to continue.[9] And "[t]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[10]

Here, the father's history demonstrated an inability or unwillingness to establish an adequate and safe home for the children. Two of the children had behavioral problems — including a history of aggression toward other children — that required ongoing psychosexual counseling and their placements in separate therapeutic foster care homes. And although the father was directed to help and support D. B. and Q. B. by attending their counseling sessions, he avoided doing so until it was far too late. "Courts are clearly authorized to consider the special needs of a child and the parents' . . . inability [or unwillingness] to provide for those needs."[11]

---

[6] *In the Interest of R. C. M.*, 284 Ga. App. 791, 796 (I) (2) (645 SE2d 363) (2007).

[7] Id. at 796 (I) (3).

[8] *In the Interest of A. G.*, 253 Ga. App. 88, 90-91 (1) (c) (558 SE2d 62) (2001).

[9] *In the Interest of A. G.*, 293 Ga. App. 493, 496-497 (1) (667 SE2d 662) (2008).

[10] Id. at 496 (1) (citations and punctuation omitted).

[11] *In the Interest of Am. T.*, 284 Ga. App. 847, 851 (644 SE2d 923) (2007); see *In the Interest of R. N. O.*, 281 Ga. App. 161, 162 (2) (635 SE2d 420) (2006) (juvenile court did not

Furthermore, the juvenile court was authorized to assign less weight to belated efforts to comply with a case plan after termination proceedings became imminent.[12] While such efforts may have indicated an attempt to comply with the DFCS reunification plan, they fell short of negating years of abandonment and harmful neglect.[13] Moreover, the evidence here authorized the juvenile court to find that the father had failed to implement sufficient precautions in his home to safeguard his children.

Despite the father's efforts to comply with some aspects of the case plan and his claim at the termination hearing that he wanted to maintain parental rights to his children and wanted all five children in his care, the juvenile court's finding as to the continuation of deprivation was supported by clear and convincing evidence.[14] Accordingly, the father's sole challenge to the juvenile court's finding of parental misconduct or inability is without merit.

2. The father also contends that there was insufficient evidence to support a finding that termination was in the children's best interests. He asserts that, from their births, he had a relationship with them until their mother moved out of their home. According to the father, DFCS was partly to blame for their subsequent extended disconnect: "[H]ad [DFCS] done a diligent search for the biological father when the children were removed, as it should have, he would have been involved at least a year and one-half earlier." In addition, he points out that the guardian ad litem remarked at the hearing in May 2009 that her observations of the father with his children led her to believe that he loved his children and that his children loved him.

The juvenile court was not bound to find DFCS responsible for

---

abuse its discretion in denying grandmother's custody motion for children, where there was concern that grandparents lacked capacity to provide for special needs of children; one child had psychosexual behavioral problems and a history of aggression against the other, requiring their separate placement in foster care).

[12] *In the Interest of K. D.*, 285 Ga. App. 673, 684 (4) (647 SE2d 360) (2007).

[13] Id.

[14] See *In the Interest of K. A. C.*, 290 Ga. App. 310, 313 (3) (659 SE2d 703) (2008) (in determining whether deprivation was likely to continue, considering, inter alia, the parent's failure to safeguard the child from his sexual abuser); *In the Interest of C-J. N.*, 289 Ga. App. 423, 426 (1) (657 SE2d 329) (2008) (evidence, including the mother's past inability to protect her children from sexual abuse, her failure to address longstanding portions of her case plan, and her failure to appreciate the requirements for caring for her child, authorized finding that deprivation was likely to continue); *In the Interest of Am. T.*, supra; *In the Interest of R. N. O.*, supra; *In the Interest of H. Y.*, 270 Ga. App. 497, 504-505 (1) (c) (606 SE2d 679) (2004) (in determining whether deprivation was likely to continue, considering, inter alia, the parent's inadequate response to recommendation that the children sleep separately, where one child reported being sexually molested by another, as well as the parent's refusal to seek proper treatment for the alleged molesting child who had been diagnosed with psychological disorders).

the father's estrangement from his children; indeed, other than intermittent telephone calls to the mother's family members, the father cites nothing showing that he attempted to maintain a relationship with his children after they were moved out of the home he shared with them. Furthermore, the evidence showed that when the children were later placed in foster care, the father was responsible for missing, truncating, and even ceasing scheduled visitations.

The same evidence showing parental misconduct or inability may, and does here, support the required finding that termination of parental rights is in the best interests of the children.[15] In addition, the juvenile court was "authorized to consider the children's need for a stable home situation and the detrimental effects of prolonged foster care."[16] Here, the children had been in DFCS custody for almost four years. "Children need permanency, stability, and a safe environment,"[17] which the father failed to demonstrate that he could or would provide. Meanwhile, Jas. B. and Jal. B.'s foster mother had given the twins a stable home and expressed a desire to adopt them. And Q. B.'s foster mother, with years of experience in providing therapeutic foster care, had provided stability and a safe environment for that child, was willing to adopt him, and testified further about her ability, capacity, and willingness for D. B. to live with them, too.

Given this record, we conclude that the juvenile court was authorized to find that termination was in the children's best interests.[18]

*Judgment affirmed. Miller, C. J., and Johnson, J., concur.*

DECIDED SEPTEMBER 17, 2010.

*Sandra B. Keil*, for appellant.
*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior*

---

[15] See *In the Interest of T. J.*, 281 Ga. App. 673, 675-676 (1) (637 SE2d 75) (2006).

[16] Id. at 676 (1) (citation and punctuation omitted).

[17] Id.

[18] See generally *In the Interest of J. A.*, 286 Ga. App. 704, 708 (649 SE2d 882) (2007) (in light of the fact that at the time of the hearing the child had spent three of her four years of life in foster care, evidence of the father's failure to establish a suitable home and a stable income, failure to become drug free, and failure to comply with his reunification plan goals was sufficient to support the juvenile court's finding that termination of the father's parental rights was in the child's best interest); *In the Interest of T. J.*, supra; *In the Interest of S. G.*, 271 Ga. App. 776, 781 (611 SE2d 86) (2005) (same factors which showed the existence of parental misconduct or inability also supported the finding that termination of appellant's parental rights was in the child's best interest, and in making that finding, the court properly considered that the foster parent with whom the child had been living since being placed in DFCS's custody had expressed an interest in adopting the child).

*Assistant Attorney General, Kathryn A. Fox, Assistant Attorney General, Andrew S. Foster,* for appellee.