A11A0304. IN THE INTEREST OF T. P. et al., children.
(713 SE2d 874)

PHIPPS, Presiding Judge.

The father of twins T. P. and J. P. appeals the juvenile court's order terminating his parental rights to them. Finding no merit in the father's claims of error, we affirm.

OCGA § 15-11-94 sets forth the relevant procedure for termination of parental rights and involves two steps.

> First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[1]

This court views the evidence in the light most favorable to the juvenile court's ruling to determine whether any rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated.[2]

The record shows that the children, who were born in August 2003, were placed in the custody of the Department of Family and Children Services (DFCS) within days of their birth because their mother had tested positive for cocaine. The juvenile court adjudicated the children deprived as to the mother.[3] There initially was some dispute regarding the children's paternity; however, by September 2004 the appellant had been established as their biological father, and the court had entered an unappealed order adjudicating the children deprived as to the father because they were without

---

[1] *In the Interest of J. R. N.*, 291 Ga. App. 521, 525 (2) (662 SE2d 300) (2008) (footnote omitted).

[2] Id.

[3] The mother's parental rights later were terminated, and that termination is not at issue in this appeal.

proper care and control, specifically finding that the father had not legitimated the children, he had failed to be a part of their lives, he had not provided any financial support for them during the previous 12 months, he had a history of abusing illegal drugs and had failed to complete a substance abuse treatment program, and he was without stable housing.

The father subsequently legitimated the children. He also entered into a reunification case plan with DFCS, which set goals for him to obtain substance abuse treatment, employment, stable housing, and childcare. Over the next two years, the juvenile court entered several unappealed rulings that the children continued to be deprived but found that the father was visiting the children and progressing on his case plan goals, which had expanded to include the father's participation in parenting classes and counseling. In 2006, the court granted the father unsupervised visitation with the children.

On February 11, 2007, J. P., then three years old, returned from an unsupervised weekend visit with his father with bruises on his buttocks, legs and thighs, and that night he was admitted to the hospital. J. P. reported to a DFCS caseworker that his father had struck him with a belt. The court suspended the father's unsupervised visitation with the children.

In September 2007, the juvenile court entered an order again adjudicating the children deprived; this order was unappealed. Therein, the court noted that the father previously had achieved his case plan goals. It based the deprivation adjudication on the father's act of striking J. P. with a belt, resulting in visible injury to the child. Also that month, DFCS petitioned to end reunification services with the father and seek adoption with one of the father's relatives. The following month, a court-appointed child advocate attorney petitioned to terminate the father's parental rights.

The juvenile court held a series of evidentiary hearings in February, March, April and May 2008. The children's foster mother testified to discovering J. P.'s injuries when the children returned from the February 2007 visit with their father. When she asked J. P. what had happened to his bottom, he replied, "[M]y daddy hurt it."[4] The foster mother also asked T. P. what had happened, and he replied that J. P. had been spanked at the father's house. The foster mother contacted the authorities and took J. P. to the hospital, where he stayed overnight. She testified that in the months following the February incident, the children began to exhibit behavioral prob-

---

[4] This and other statements by the children regarding J. P.'s injuries were admitted pursuant to the child hearsay statute. See OCGA § 24-3-16.

lems, specifically aggression, at home and at school.

A physician who treated J. P. at the hospital testified that he was admitted with extensive, widespread bruising. He also had some scarring on his back suggesting an older injury; the scarring was consistent with having been struck with a belt or extension cord. Based upon her examination of J. P., the physician opined that, to a reasonable degree of medical certainty, the child demonstrated signs of "both remote and recent inflicted trauma of physical abuse," and that the trauma was "much more severe than typical accidental trauma."

A DFCS caseworker testified that she met with the foster mother the night of February 11, 2007, and observed the child's injuries. She asked J. P. what had happened, and he responded that his father had whipped him. Another DFCS caseworker who investigated J. P.'s injuries testified that the child told her his father had whipped him with a belt.

The father testified at the hearings, but when asked what had occurred during his visit with the children on February 11, he invoked his Fifth Amendment right against self-incrimination. The father testified that he was employed, had maintained a residence for three years, and had paid monthly child support for two to three years. He regularly attended individual counseling and a substance abuse support group, and had weekly supervised visitation with the children. He was no longer using any illegal drugs.

A clinical psychologist who evaluated the father in September 2005 testified that, at the time of the evaluation, he held the opinion that the father was not capable of caring for the children. The father's cognitive functioning was well below what was typical for someone his age. As a result, in the psychologist's opinion, the father would have significant problems managing his affairs and making daily parenting decisions, including decisions about discipline. At the time of the evaluation, the father had very poorly applied the principles and concepts he previously had been taught in parenting skills classes. The psychologist also opined that the father displayed emotional instability and anger management problems. He recounted an instance in which the father, who was angry about the contents of the psychologist's evaluation of him, called him on the telephone and yelled at him until the psychologist ended the call.

The psychologist further testified that he would not be comfortable changing his opinion of the father's parenting capabilities without evidence that the father had been able to implement the skills learned through classes and counseling. If the father had used physical discipline on a child, to the extent alleged in this case, this would indicate to the psychologist that the father had not been able to incorporate his past therapy into his conduct and still had

problems with anger modulation and control.

A case manager with an agency that provided reunification services to the father testified that the father was cooperative and compliant, and that he demonstrated appropriate parenting skills. She recalled an incident, however, where the father reacted angrily when J. P. wet his pants, and she testified that the father was frustrated with the child's toilet training progress. She stated that the father's initial expectations regarding toilet training were too high for the children's ages. The case manager conceded that if the allegations of abuse against the father were true, that would change her opinion regarding his parental fitness, although she still held the opinion that he could learn to be an effective parent. A friend of the father testified that the father had told him he was in trouble because he spanked one of the children for a toilet training accident.

1. In the order on appeal, which was issued on February 27, 2009, nunc pro tunc to May 14, 2008, the juvenile court found that the children were deprived, and that the father was unable to provide proper care for the children. The court cited evidence that, despite having met his case plan goals including parenting classes and counseling, the father had used physical discipline upon J. P. of such severity that it led to a hospital stay for the child and the father's arrest on a charge of child cruelty; the court also noted that it had drawn a negative inference regarding how the father would have answered questions about the February 11 incident, had he not exercised his Fifth Amendment rights.[5] The father argues that there was not clear and convincing evidence to support the court's findings.

A child who is without proper parental care or control is a deprived child under OCGA § 15-11-94.[6] And, pertinently, that Code section provides that "[i]n determining whether [a] child is without proper parental care and control, the court shall consider, without being limited to, . . . evidence of past egregious conduct of the parent toward the child or toward another child of a physically . . . abusive nature."[7] There was clear and convincing evidence to show that the father had engaged in past egregious conduct of a physically abusive nature toward J. P. by imposing physically abusive discipline on the

---

[5] See *In the Interest of A. A.*, 293 Ga. App. 471, 474 (1) (667 SE2d 641) (2008) ("[a]lthough a parent may plead the Fifth Amendment in juvenile protection proceedings, if a parent does so, the trial court may infer that a truthful answer would be harmful") (citations and punctuation omitted). See also *Simpson v. Simpson*, 233 Ga. 17, 21 (209 SE2d 611) (1974).

[6] See OCGA § 15-11-94 (b) (4) (A) (i) (in considering the termination of parental rights, the court must determine whether the child is a deprived child, as that term is defined in OCGA § 15-11-2); see also OCGA § 15-11-2 (8) (A) (pertinently, defining a deprived child as a child who is without proper parental care or control).

[7] OCGA § 15-11-94 (b) (4) (B) (iv).

child; specifically, there was medical evidence regarding the nature and extent of J. P.'s injuries and evidence that the injuries had been inflicted by the father.[8]

Citing *In the Interest of C. L. Z.*,[9] however, the father contends that evidence about the February 2007 incident, standing alone, was insufficient to show present deprivation. We held in that case that evidence of a single incident, in which a child's legal guardian was observed screaming at the child, blindfolding her, and pushing her into a vehicle, was not clear and convincing evidence of present deprivation.[10] In so holding, we noted the lack of evidence that the guardian "had a history of mental or emotional problems or that she routinely had difficulty controlling her anger. The evidence presented did not show that this was anything other than an isolated, albeit highly inappropriate, outburst by the [guardian]."[11]

Unlike in *In the Interest of C. L. Z.*, evidence was presented that the father in this case had cognitive problems that affected his ability to parent and to implement skills learned in parenting classes and counseling; that he had a history of anger management problems; that he had engaged in an angry outburst in a telephone call with the evaluating psychologist; that he had displayed anger over the issue of J. P.'s toilet training; and that he had admitted to physically disciplining J. P. in connection with toilet training. Moreover, the psychologist who had evaluated the father testified that, under the circumstances, he would not change his earlier opinion that the father was not capable of parenting the children. Although the father argues that there was no evidence that he engaged in any other physical discipline of the children after the February incident, the evidence showed that the father had no unsupervised visitations with the children after that date.

The juvenile court did not err in concluding that the children were deprived and that the father was unable to provide proper parental care for them.[12]

2. The juvenile court found that the father's inability to provide proper care for the children was likely to continue. The father argues that there was no clear and convincing evidence to support that finding, and he points to evidence that he substantially completed his

---

[8] See *In the Interest of K. J. M.*, 282 Ga. App. 72, 75 (2) (b) (637 SE2d 810) (2006) (the extent of a child's injuries provided evidence that he was subjected to serious physical abuse while in his parent's care and supported a finding that he and his sibling were without proper parental care or control).

[9] 283 Ga. App. 247 (641 SE2d 243) (2007).

[10] Id. at 249.

[11] Id. (footnote omitted).

[12] See *In the Interest of A. A.*, supra at 474-475 (1).

case plan by obtaining stable housing and income, participating in parenting and counseling sessions, regularly visiting the children, and cooperating with DFCS.[13] The juvenile court found, however, that the father remained unable to provide proper care for the children despite his numerous efforts. It was for the juvenile court, rather than this court, to decide what weight to give any improvements from the father's continued counseling.[14] And there was evidence that, as it related to anger management and child discipline, the father had not previously been able to implement the lessons and skills that he had been taught in his parenting classes and counseling sessions and that his cognitive limitations cast doubt upon his ability ever to apply those lessons.[15]

The juvenile court did not err in finding that the deprivation was likely to continue.[16]

3. The juvenile court found that, because of the father's continued inability to provide proper care for the children, they remained "at risk of continued and serious physical, mental, emotional and moral harm as evidenced by the severity of the injuries sustained by [J. P.] while visiting with his father." The father argues that there was no clear and convincing evidence to support this finding. Here, the evidence showed that the father's inability to provide proper care for the children had led to physical injury to one of the children, and that the father had not demonstrated the ability to implement what he had been taught in counseling or parenting classes to modify his conduct. We find no error in the trial court's finding.[17]

4. The juvenile court found that the termination of the father's

---

[13] See *In the Interest of T. B.*, 249 Ga. App. 283, 286-287 (1) (548 SE2d 45) (2001) (juvenile court's finding that mother's "history and pattern of instability" was likely to continue was not supported by clear and convincing evidence, where evidence showed that, well before termination petition was filed, mother began stabilizing her life and she continued those efforts throughout the ensuing months).

[14] See *In the Interest of R. J. D. B.*, 305 Ga. App. 888, 894 (1) (a) (700 SE2d 898) (2010).

[15] See *In the Interest of R. B.*, 309 Ga. App. 407, 410-411 (1) (710 SE2d 611) (2011) (evidence supporting juvenile court's finding that child's current deprivation was likely to continue included testimony from evaluating psychologist that, even with parenting and anger management classes, the mother's lack of cognitive capacity, communication skills, and cognitive flexibility rendered her incapable of learning the skills necessary to properly care for the child).

[16] See id.

[17] See *In the Interest of I. S.*, 238 Ga. App. 304, 309 (520 SE2d 470) (1999) (continued deprivation due in part to mother's violent behavior could cause serious physical harm to children). Compare *In the Interest of K. D. E.*, 288 Ga. App. 520, 526 (1) (654 SE2d 651) (2007) (noting that there was "no testimony that a continued relationship with [the] mother would result in any potential or actual harm to the child"); *In the Interest of J. M.*, 251 Ga. App. 380, 383-384 (4) (554 SE2d 533) (2001) (noting that the juvenile court did not set forth any facts supporting its conclusion that continued deprivation was likely to harm the children, and that there was no evidence in the record that the children's relationship with their mother was harmful to them).

parental rights was in the children's best interest. The father argues that this finding was error.

The same evidence showing parental misconduct or inability may, and does here, support the required finding that termination of parental rights is in the best interest of the children.[18] The children had been in DFCS's custody since their birth nearly five years earlier. Over that period of time, despite his efforts, the father had not been able to establish that he could properly care for the children, such that they could be placed in his custody instead. The children's foster mother and their aunt both expressed the desire to adopt them, and evidence was presented regarding these persons' ability and capacity to do so. In determining the children's best interest, the juvenile court was "authorized to consider the children's need for a stable home situation and the detrimental effects of prolonged foster care."[19] Given this record, the juvenile court was authorized to find that termination was in the children's best interest.[20]

*Judgment affirmed. Andrews and McFadden, JJ., concur.*

DECIDED JULY 8, 2011.

*Good & Lee, Darice M. Good*, for appellant.
*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Jerry W. Thacker*, for appellee.

---

[18] See *In the Interest of T. J.*, 281 Ga. App. 673, 675-676 (1) (637 SE2d 75) (2006).

[19] Id. at 676 (1) (citation and punctuation omitted).

[20] See *In the Interest of D. B.*, 306 Ga. App. 129, 139 (2) (701 SE2d 588) (2010); *In the Interest of T. J.*, supra.